FARRELL v. HAZE.

1. TRIAL—PRACTICE—PERMITTING JURY TO TAKE EXHIBITS.

Where a physician had made memorandums of visits to a patient who subsequently brought an action for malpractice, and had made entries in his account books which tended to support the defendant's testimony, it was within the discretion of the trial court to refuse permission to the jury to take them into the jury room.

2. EXPERT AND OPINION EVIDENCE—PROXIMATE CAUSE.

Amputation of plaintiff's foot followed a Potts fracture and some time after treatment by the defendant as a physician, in which a plaster cast was used to set the broken bone; in an action for negligent treatment, where the opinions of the expert witnesses as to the cause of amputation did not support the contention that the result more probably came from the method of treatment than from the injury, the jury should have been instructed that defendant could not be charged with the loss of the foot.

3. NEGLIGENCE—MALPRACTICE—PHYSICIANS.

The plaintiff, in an action for malpractice, must fail upon a showing equally consistent with negligence, or with reasonable care on the part of his physician.

4. EVIDENCE—HYPOTHETICAL QUESTIONS.

Opinion evidence, based on a hypothetical question as to the propriety of treatment adopted by plaintiff's physician, whereby the interrogatory conditions were incorrectly assumed to have followed one upon the other, and the length of time intervening between the treatment and subsequent amputation, with other material elements, were omitted, is incompetent.

5. SAME—EFFECT OF OFFERING INCOMPETENT EVIDENCE.

Where bones of plaintiff's amputated foot were offered and rejected as evidence, and the proposed exhibits were incompetent because their condition had materially changed after defendant ceased to treat the foot, the production of the incompetent evidence was prejudicial and improper.

6. SAME—CROSS-EXAMINATION.

It is inadmissible to show, on cross-examination, that the de-

fendant had been employed to treat another case, a different surgeon later called in, the treatment changed, and defendant discharged.

Error to Ingham; Miner, J., presiding. Submitted April 30, 1909. (Docket No. 27.) Decided July 6, 1909.

Case by Thomas Farrell against Harry A. Haze for malpractice. A judgment for plaintiff is reviewed by defendant on writ of error. Reversed.

*Tuttle, McArthur & Dunnebacke* (*Rollin H. Person*, of counsel), for appellant.

*Jason E. Nichols*, for appellee.

OSTRANDER, J. Plaintiff, on April 2, 1907, at about 10 o'clock a. m., sustained an injury to his right foot, ankle, and leg. It was what is known as a "Potts fracture." He fell from a wagon to and upon the pavement. There is some testimony tending to prove that the wagon seat fell upon and across the foot or ankle. The foot was turned outward to a position at right angles to the leg, and perhaps it formed with the leg a more acute angle. The skin was not broken. In a fracture so described the fibula is broken. In this case the tibia was also broken. The extent to which the surrounding tissues were injured, and whether or not the artery or arteries nourishing the particular portion of the anatomy was or were ruptured or otherwise injured, cannot be accurately determined in such a case except by the consequences. He employed the defendant, a physician and surgeon, to treat the injury. Defendant attended him until April 14th, when he was discharged and another surgeon was employed. The foot was opened by still other surgeons on July 23d, at Detroit, and some dead bone was removed. Later, it was found to be necessary to amputate the leg, and the operation was performed August 21, 1907. After reducing the fracture with the assistance of another surgeon, the defendant put the injured member in a plaster

of paris cast. It is the theory of the plaintiff that the swelling of the limb and foot which immediately ensued, accompanied by pain and by discoloration of the tissue, indicated, and ordinary professional skill and knowledge, demanded, an early cutting of this cast. It is alleged that it was kept in place so that the leg, ankle, and foot had no opportunity to swell, and that the circulation of blood in the limb was cut off and stopped until Sunday, April 7th, at which time the leg, foot, and ankle had become dead and black, spoiled and ruined. Later operations, including the amputation of the limb, are consequences attributed to the strangulation caused by the cast. It is the theory of defendant that the cast was cut —opened—on Wednesday, April 3d, and was thereafter for some time used as a cradle for the injured member, into which, after daily dressing, it was returned; that in any event the diseased condition of the limb, present at the time it was amputated, was due—or was not shown not to be due—to the original injury, aided, perhaps, by the treatment of the surgeon who immediately succeeded the defendant. These theories present the issues which the pleadings and the testimony presented to the court and jury. If defendant cut—opened—the cast on Wednesday, he is admittedly without fault. If he did not cut it until Sunday, and if the foot and leg were then in the condition described by plaintiff and his witnesses, he did not exercise ordinary professional skill and judgment, and for the resulting injury he is liable. What the resulting injury was, is matter of serious dispute. Defendant did not neglect his patient. The cast was applied about noon on Tuesday. He visited plaintiff at his house three times that afternoon and evening, and after that twice each day until he was discharged.

There is no material difference in the views of the surgeons who gave testimony in this case upon certain propositions. The use of the cast was proper. The longer it was left in place, if no complications developed, the better. The danger to be apprehended was strangulation.

To aid observation, the toes were not covered by the cast. Some inflammation of the foot and ankle as a result of the injury was to be expected; how much there would be, could not be known. Whether the cast should be opened, and when it should be opened, depended upon the presence or absence of various symptoms, among them the amount of swelling and the discoloration of the foot. The temperature of the body, the pain experienced, affect the judgment of the surgeon in this behalf. Different surgeons will act differently in cases presenting the same symptoms. There is great danger, in case of an injury such as was suffered by the plaintiff, that troublesome complications will result from the tearing or lacerating of tissue, the breaking of bones, and injuries to arteries. Necrosis often results from traumatic injuries —from the bruising of the bone. In view of the unanimity of opinion of experts upon these subjects, and the frankness with which defendant admitted that, if he left the cast in position until Sunday and until the limb was in the condition described by plaintiff and his witnesses, he had not exercised skill, we find it unnecessary to discuss many of the errors assigned and relied upon by counsel for appellant. Those which we regard as demanding attention may be disposed of under two general heads. They are: *First*, those relating to the time when the cast was removed; *second*, those relating to the injuries consequent upon appellant's failure, if he did fail, to earlier cut the cast.

*First*. Defendant testified that he cut the cast on Wednesday, the next day after the injury. He kept books and employed a bookkeeper. It was his practice to make a memorandum of visits to patients upon prescription blanks, and to hand the memorandums to his bookkeeper for entry by her into a daybook. She also kept a ledger. The slips, daybook, and ledger were produced in court, and were offered and received in evidence over the objection that they were all immaterial, incompetent, and self-serving. The purpose in offering them was not to

show the state of an account with plaintiff, but to corroborate defendant's testimony concerning the date of cutting the cast by a memorandum made by him at the time. The particular memorandum, upon the particular slip, was "4–3," meaning fourth month, third day, "Tom Farrell vt," meaning visit, "p. m. and cutting cast $1.50." Various memorandums made under dates from the 5th to the 13th, inclusive, contain charges for redressing the leg. These are supposed to corroborate defendant's testimony that the cast had been cut, since it is claimed there could be no redressing of the limb if it was not cut. In the argument to the jury, it was claimed on the part of plaintiff that a comparison of the slips, the books, and certain testimony of defendant would and did show that the entry of the charge made for cutting the cast on the day stated was spurious. Much time was devoted in argument to the memorandum slips and the books. They appear to have been exhibited and handed to the jury, or to some of the jurymen. Counsel for the plaintiff in his argument to the jury said that so far as he was concerned the books and slips might be taken to the jury room. One of defendant's counsel said, "Do we understand it is agreed that the jury may have the books?" and the reply was, "I will say, so far as I am concerned, I don't think there was any question about my statement. * * *" Counsel for defendant said, "All right." The jury having been instructed and having retired, the court inquired if it was agreed that the books and slips should be taken to the jury room. The attorney of record for plaintiff declined to consent. Upon the claim being made that it had been agreed to, the court said he did not understand there had been any such agreement, and that unless there was such an agreement he should decline to give the books to the jury. Later, the jury, through the officer in charge of them, requested that the exhibits, the daybook and ledger, be sent to them. This the court refused to do. Counsel for defendant thereupon requested that the jury be recalled and be per-

mitted to examine the slips and books in the jury box. This was refused.

It appears from the argument of counsel for defendant that it was understood there was no agreement that the slips and the books might be given to the jury in the jury room.   The testimony of Dr. Haze, the defendant, concerning the slips, or memorandums, is:

"There is no handwriting on them not mine.   They are the tablets kept by me at the time of my treatment of Mr. Farrell.   The entries upon these tablets were made at the dates they bear.   I am able to say positively that every visit and all matters on these various tablets occurred at the time as therein stated.   I do not think that I could state from memory alone, and without the tablets, just the day when the accident occurred.   The girl found these tablets for me about the first of this year, when they were talking about beginning suit against me.   It was before the suit was brought.   I had never seen them from the time they were made until the time she found them for me."

Assuming, but not deciding, that the memorandums were evidence to the jury of the facts contained in them (*Halsey* v. *Sinsebaugh*, 15 N. Y. 485; *Fisher* v. *Kyle*, 27 Mich. 454.   Compare *Weaver* v. *Bromley*, 65 Mich. 212 [31 N. W. 839]; *Collins* v. *Shaw*, 124 Mich. 474 [83 N. W. 146]; *Kalamazoo Novelty Manfg. Co.* v. *McAlister*, 36 Mich. 327), it was within the discretion of the court to allow them to be taken to the jury room.   *Tubbs* v. *Insurance Co.*, 84 Mich. 646, 655 (48 N. W. 296); *Bulen* v. *Granger*, 63 Mich. 311 (29 N. W. 718).   We do not find there was an abuse of discretion.

*Second.*   Counsel for defendant requested the court to instruct the jury as follows:

"The question whether the loss of the plaintiff's foot was attributable to anything that the plaintiff claims the defendant did or omitted to do is a scientific question, which the jury cannot determine for itself, and can only be answered by an expert; and inasmuch as no expert or medical man or surgeon has stated that the loss of the foot in his opinion came from anything the defendant did

or omitted to do, therefore I charge you that you cannot take the loss of the foot into consideration in this case or hold the defendant liable therefor."

This was refused, and upon this point the court instructed the jury, using varying methods of expression, that they must find, by a preponderance of the evidence, that the amputation followed the alleged strangulation of the limb as effect follows cause; that the diseased condition which made amputation necessary was caused by the continued and improper use of the cast. The jury were further instructed:

"Several experts have been produced who have given their testimony upon the part of the plaintiff and upon the part of the defendant. This case is a case in which it was necessary that experts should be summoned for the purpose of determining certain of the facts in the case. And where the experts agree upon any fact which is necessary—that is, upon expert evidence—you should take that as true. But where they disagree, then you should determine from all the evidence in the case where the truth lies."

It is said in the brief for appellee, "I am challenged * * * to point out in the record any testimony that the cast was to blame for the subsequent amputation," and counsel directs attention to particular testimony of particular witnesses. The testimony so referred to is here set out:

*Dr. La Ferte:*

"*Q.* And if the cast was not removed until the Sunday morning following, what would be the result?

"*A.* Well, I suppose it would have resulted in just what we feared it would if it was not opened, mortification of the limb probably. In other words, a deadening of the limb. Very likely the leg would have to be cut off. Under the conditions you stated, it would be improper to leave the cast on at that time."

*Dr. Barber:*

"*Q.* If the hurt occurred on Tuesday, and on the afternoon of Tuesday there was pain and a swelling of the toes, and that pain increased in intensity and the toes kept

swelling, turning blue, and was left there in that condition without opening until Sunday, when the toes were practically black, would it be proper treatment to leave it that length of time in that cast or form ?

"*A.* It would not. * , * * I would expect a destructive inflammation of the tissues underneath the cast. * * * The object of padding the leg as I have described is for the protection of the circulation of the blood and equalizing the pressure. The greatest danger in applying these casts is in the unyielding nature of the splint. * * * I have never heard of any cases that were not opened at all that you did not have trouble."

*Dr. Shank:*

"*Q.* Suppose a foot was placed in a plaster of paris cast before the injured limb had time to swell except to some extent on the inner malleolus—placed in the cast at about 11 o'clock or at 12, and in the afternoon the patient experienced extreme pain and burning sensations in his limb and foot covered by the cast, and the toes began to swell, and within the next day or so they kept on swelling and turned purple, I want to ask you if it would be proper treatment to inject morphine and allow that cast to remain without being cut open ?

"*A.* I do not think the morphine had much to do with the question, but the cast should be cut open at once, because it would be perfectly evident that there was a strangulation of the returning circulation, and if the cast was not cut open the limb would probably become ruined and spoiled; if there is too great pressure with a persistent increase in the swelling of the toes there will be pain.

"*Q.* Is it not well, in order to avoid undue pressure upon the leg, to split the cast its entire length before it has quite hardened ?

"*A.* It might be well; I have never seen it done in my life, and it is not the common practice. They are always split by competent physicians as soon as the toes begin to swell and turn blue or show evidence of strangulation.

"*Q.* If the patient was a young man of thirty years of age, strong, healthy, robust laboring man, working at paving brick and the like, and he should have such a hurt as I have described, and the limb be placed in a plaster of paris cast before the swelling other than I have described, the patient experiencing such pain Tuesday afternoon that it becomes practically unbearable, the toes begin to swell

and keep on swelling until they become almost solid, and discolored, as some of the witnesses have said, black, and the cast be left there until the following Sunday, would that be proper treatment?

"*A.* No."

*Dr. Culver:*

"It would be bad practice not to open the cast under those conditions. I would expect serious results to follow if it were not opened. It would endanger not only the limb, but the life, to let that go on."

*Dr. Thoms:*

"*Q.* It would not be proper to leave the limb there until Sunday morning, would it?

"*A.* No, sir.

"*Q.* It would be bad practice, would it?

"*A.* Yes, sir.   *   *   *   If left on that long, I would expect trouble."

The most, if not all, of this testimony assumes the truth of certain hypotheses stated by counsel. None of the seven or eight surgeons who testified expressed the opinion that the diseased bones, the condition which necessitated amputation, resulted from the use of the cast. On the contrary, such an opinion is refused by several of them who saw and who treated the plaintiff after defendant had been discharged. The concensus of opinion, where opinion is expressed, is that, if the cast caused strangulation of the limb, the effects would be visible first in the soft tissues. They would be the first to break down.

Dr. Barber, a witness for plaintiff, who claimed that he had examined the bones of the foot and leg after amputation, and who gave testimony concerning the extent to which portions of the bones had been removed, testified:

"*Q.* Well, then, I will refer to the hypothetical question I asked you this forenoon as 'A.' Now, assuming the facts in 'A' to be true, that, as you will remember, involved the whole question of this treatment, and I am inclined to think the treatment afterwards and the injury,

etc.— I am asking you now if from those facts, and the facts that have been stated to you here in regard to asking you questions regarding the condition of this limb, if from those facts you can form an opinion as to the cause of the condition of the tibia or shin bone just below the place where it was amputated?

"*A.* Yes.

"*Q.* What caused that condition from the premises that I had stated in this former question? * * *

"*A.* There was nothing in the conditions of the bone, or the membrane covering the bone in the location in question, that any surgeon could state positively what caused it. * * * I think it was caused by the injury and the interference of the circulation, possibly from the cast, and the absorption or infection that produces periostitis and osteomyelitis."

Dr. Keane, a witness for plaintiff, who, with Dr. La Ferte, operated upon plaintiff in Detroit, said:

"*Q.* Assuming that statement of facts to be true that I have read to you in the question put [the manner in which the injury was caused and the dislocation reduced], and supposing that in two or three days the toes began to turn purple and the pain increased, and it continued up until Sunday following the injury, and the cast was opened up, swelling increased, and after the cast was removed the leg quickly filled to a large size with such a pressure that the injured person thought that the skin would burst, after which formations of water blisters occurred upon the limb, and those into ulcers which necessitated their being lanced, what would you attribute that condition to?

"*A.* Some interference either of the arterial or venous circulation.

"*Q.* Would you attribute it to the cast?

"*A.* It would be due to interference of the circulation in some way. I could not attribute it to the cast to the exclusion of everything else, and would not do so. * * * If the cast should remain on a great length of time and the toes should become purple and eventually black, it would be probable that mortification had set in, and if that condition was allowed to remain for some hours or a day it would not be possible to save the toes at all. There was no mortification or gangrenous condition in the toes when I saw them, and from my observation of the toes I

would say that there had never been any gangrene or mortification of them. I think if gangrene was present it would have continued and extended further; there might have been blackness due to venous congestion; that would not necessarily be mortification. If there had ever been any blackness of the toes indicating lack of circulation, no harm would have been done if the circulation was restored. * * * The breaking of the bones and the jamming of them, if it took place in the foot, would be likely to injure the arterial circulation in that proximity. If the arterial circulation was injured in the foot, it would not get its proper nutrition, and mortification would be liable to set in. The parts of the foot that were injured in this case would receive part of their supply from that artery; it would be possible for the absorption of the waste in the foot to cause swelling. We found the bones there quite badly diseased; they were soft and almost like sand; this would indicate that they had been diseased for a couple of months; it would be possible for such a state of the bone to come from the original injury due to mortification caused by interference with some of the arterial supply. * * * Where an ankle is dislocated and a Potts fracture takes place, the danger lies in the pressure of the fragments on the circulation—on the artery. The danger where a cast is put on lies in pressure upon the circulation; this is more apt to be true of a solid cast than of a soft one. A cast of this kind becomes solid within half or three-quarters of an hour. Sores are liable to result where there has been undue pressure with a plaster paris cast. These sores would appear at those points where undue pressure was placed. * * * If the posterior tibial artery was shut off, there would still be branches here from the anterior part that would go through those small bones and supply the leg to a certain extent, but it would not be a full circulation. If one of the larger arteries was cut off or stopped up and the other was doing its best to supply the blood, the effect of want of nutrition would first appear in the proximity of the artery that was impaired or stopped. The part farthest from the part where it was stopped would be apt to die quicker; it would be largely a matter of a short time in either instance. If one of those large arteries was stopped up, cut off, or impaired, I would not expect the other artery to supply blood enough to take care of the foot permanently. The posterior tibial artery furnishes the most of the blood to the

foot; that is, the one near where there was bad bone and near the internal malleolus, where the fracture of the tibia was. * * * When I cut the foot off there was gangrene on the heel; I don't believe there was any gangrene there when I first saw the foot. The posterior tibial artery supplies that part of the foot where the gangrene was. Of course, there would be little branches thrown off from the tibial artery that supplies the soft skin parts. In our judgment, the gangrene was due to a pressure and the lower vitality of the tissues at that part; this may happen by the patient lying in bed without any cast or splint at all.

"Q. Now, you found that gangrene in August, and this accident occurred in April. There was evidently a gradual decay or impairment going on there for months, wasn't there?

"A. Yes, sir.

"Q. If there had been but one artery supplying that foot, if the other had been cut off at the time of the accident, wouldn't it have caused that sort of a gradual impairment of that foot for four or five months if either one of the arteries had been cut off?

"A. I think so. I think there was some interference with the circulation which went on longer after the cast was removed. There was some gradual mortification there; this might well have happened if one of the arteries had been impaired in its work; where it once breaks down it travels on and goes into the bone and unless that bone is taken out and got rid of it extends to other bones."

*Dr. La Ferte* said:

" If the toes were swollen full and black, that would indicate that mortification had set in. If mortification has set in, we try to save them, you understand. If the toes were black and swollen full, they could not be saved; you might save the foot and cut off some of the toes. We would make an effort to save them if there was any part of them the natural color. The part that was black would be dead and would have to be cut off. That would have to be cut off just as soon as we made up our mind that they could not be saved, and we would make up our mind to this just as soon as they were black.

"Q. From the condition you saw when you examined that foot, could they have been black in April and stayed

there and been in the condition you saw them, black from strangulation?

"*A.* Why, I don't think they could. Not from April to July.

"*Q.* Wouldn't they have been rotted off from their own accord before that, and the man been dead if they were in that condition in April and nothing done with them?

"*A.* Well, they probably would have shown signs of demarkation there, of course. The toes when I saw them were about the same color as the foot; they were kind of doughy and swollen, and pitten on pressure some. They were not gangrenous then, and I don't think they were black.

"*Q.* And you say that from that condition that they would not have been black in April?

"*A.* I didn't say that. It might have been black from venous circulation, return of venous blood from the toes; if there was venous blood above them, that thing is possible. It might have been mortification of the parts over the toes; the cuticle or scarf skin may have been undermined or blisters. I understand there was some blisters.

"*Q.* There is no testimony there was blisters on top of the toes?

"*A.* It doesn't make any difference; they might have been black at the time that the bandage would be put on, for instance, and the toes might swell and become black and be blistered, and then if you remove the circulation soon it might be done. The cast is put on, a cast of this kind, to hold the foot in shape. The use of the cast is good, well-recognized treatment. It is desirable to leave on the plaster paris cast until the foot has got back into proper shape if you can do so. It is a good way to leave the toes out so that the doctor can keep watch of them and tell. With an injury of this kind the injured party would suffer pain, probably a good deal of pain. In treating a case of that kind, the doctor by his experience watches from what he can see to tell when the proper time is to cut the cast open. Sometimes it is not necessary to remove it at all; it will go clear through without removing. That is desirable if everything is getting on all right. With a Potts fracture of this kind, with the inner malleolus broken off, and the conditions as I found them to be, there is always danger unless the foot is held carefully in shape until it has recovered to quite an extent, or when it is healed it will be out of shape. That is one of

the things the surgeon has to guard against.  The swelling in this foot might have resulted from absorption of the waste material in the foot due to the condition of the bone resulting from the injury.  That would not be at all unlikely to be the situation from the condition that you describe—that is, an injury of the artery or cutting off of the blood supply through that portion of the tibia—the foot would be likely to swell from such an injury without a cast.  At the time of the operation by Dr. Keane there was a good deal of dead bone removed from the ankle, so much in fact we didn't get it all, and I told Dr. Keane that it would have been a good plan to cut it off, and he told me that the people would not consent to it; that the man said he would rather die than have his foot cut off, but later on he finally consented to the operation.  The thing was a mass of dead bone as I remember it, and a great deal of swelling and infiltration of the soft parts, and we removed a part of the astragalus, some of the scaphoid, and this internal cuneiform bone as near as I can get at it.  It seems to me the astragalus was tipped over and we took part of that out.  I think the part of the internal malleolus which was removed was the part that had been broken off by the injury.  Evidently it had not united, but I am not perfectly certain.  *  *  *  Strangulation of the venous blood would cause mortification; it would depend upon the length of time it had been obstructed.  I do not know as it would depend very much on his health.  The blood is sent from the heart to the body; after coming from the lungs it becomes red blood; coming from the lungs it goes into a large vessel in the abdomen, and then gets down into the thigh, and when it gets down just below the knee it divides into the anterior tibial and posterior tibial artery; it goes back through two sets of veins, a superficial set, which are very numerous, and the deep set, which accompanies the tibial arteries.  The veins would be more sensitive to the pressure like a plaster paris cast than the arteries.  What would obstruct the circulation of the blood on its return might not obstruct the circulation of the blood going to the foot, because the heart propels the blood through the arteries, and they are well covered by muscles and so on.

"Q.  Now, assuming the statement of facts that I have put into the hypothetical question to you to be true, and supposing that on Tuesday, the day he was injured, the

doctor came up there about 2 or 3 o'clock in the afternoon and looked at the foot and administered an opiate, and the toes continued to swell, and two or three days after that they begun to turn purple, and on Sunday morning following this they looked black and dark, what would you attribute that condition to?

"*A.* To an interference with return circulation.

"*Q.* And would you or not to the cast.

"*A.* Well, if there was nothing else that would interfere with the return circulation, it was the cast, I presume. From the examination that I made I could not determine whether the posterior tibial artery was blocked or obstructed. I did not investigate that part at all. A Potts fracture is a quite common fracture. A simple Potts fracture is not considered very dangerous. A compound Potts fracture—that is, a fracture that protrudes through the flesh and skin—is a serious matter. I am not certain that I saw any evidence of a compound fracture. I don't think there was. A Potts fracture is a fracture of the little bone in the ankle outside the leg, and it is by turning the foot over that sometimes breaks the lower part of the tibia, and sometimes not. My recollection is that in this case the lower part of the tibia was broken. We would call this a simple Potts fracture; possibly we would call it complicated. * * * From my examination it is my recollection that this was a complicated fracture, and not a simple one. With the breaking of the internal malleolus it is complicated. This makes it worse, as there is a tearing frequently of the ligaments here. A complicated fracture is not necessarily attended with an injury to the vessel and the softer parts. It is likely, perhaps, to be so attended."

Dr. Tyler, who succeeded Dr. Haze, said:

"At the time I was called the foot was swollen about as full as it could up to the toes from the ankle up to the leg. There was one sore around the ankle joint, some general sore condition over the inner part of the instep and down along the hollow of the foot here, quite a large sore just at the base of the toes at the ball of the foot, a sore on the bottom and back of the heel, a long sore up and down the outer side of the foot here, and on the shin bone up about here in this locality. On the outer side of the foot extending along the metatarsal bone was a long sore about three or three and a half inches long and possibly an inch wide. The surface was black and tough, thick,

hard leathery substances on the outside; the border ad-
hered firmly to the healthier flesh along the outside. The
skin was not broken in any way. I did not do anything
especially with that until the edge of this unhealthy tissue
began to let loose. I treated him somewhere near three
months before they went to Detroit. The sore that I de-
scribed commenced to loosen up nearly two weeks after I
commenced to treat him. I took it away in pieces. The
outer part seemed a hard substance like leather, and when
that came away the deeper tissue was a yellow, softer sub-
stance. When I got down as far as that went I found
healthy flesh. The substance dipped down into the edge
of the foot; when it was finally cleaned out the hole that
was left was all healthy flesh around it. What we call
granulation formed to heal it, and it healed up. The
sore on the back of the heel was practically the same
as I have just described on the side of the foot, sim-
ply a different location; I removed that. This was
somewhere two inches across, and possibly three-quar-
ters of an inch deep. The sore on the outer side of the
foot was about the same depth. When I examined the
limb on April 13th, there was some swelling up more than
half way to the knee. The condition of the tibia or shin
bone was an open sore; there was no black substance on
it, simply an open, raw sore; it healed up and broke out
once after that; the side of the foot entirely healed, as I
remember it. The inner side of the foot was an open,
raw sore over the ankle bone; I treated it with poultices
and some antiseptic dressing and washes. The swelling
gradually left the upper part of the foot that was swollen
full clear up to the toes. In the course of a week and a
half or two weeks the swelling was out of the upper part
of the foot, so it was nearly normal from the instep up
here. So far as the sore of the side was concerned, there
was not very much swelling at that part of the foot. The
swelling went out of the instep; the swelling on the outer
side of the ankle continued until he went to Detroit; the
swelling on this side was practically gone, and the foot
was healed. The heel was practically all healed, the outer
side was all healed, possibly a hair's breadth was not
healed in yet. The sore at the inner malleolus nearly
closed once, but later it seemed to open or sloughed a lit-
tle bit and opened up again; after that it never closed.
The inner ankle bone was diseased; I discovered there
was dead bone there, and as soon as I found that I told

Mr. Farrell it would have to come out before the ankle would heal; I discovered this the fore part of July—I don't remember exactly what time."

Dr. Shank, called for defendant, testified:

"I saw him on the 13th day of April, 1907. Dr. Haze asked me to go in consultation with him, and I did so. I saw plaintiff at his residence a little before noon. Dr. Haze, plaintiff's sisters and mother, were in the room at the time; if there were others, I cannot remember it. We did not have much conversation there until after he had taken the leg out of the cast and undone it; he had told me about the case going up. He lifted the limb out of the cast, undid the covering, and showed me the limb. The cast had been cut from the top to the bottom, and had a bandage loosely turned around it. It looked as though the circulation of the blood was very sluggish, and I immediately began to examine the foot myself to determine if I could where and what was the cause of the obstruction to the circulation. I felt of the artery that goes down over the metatarsal bones on top of the foot—the lower extremity of the anterior tibial, the artery that supplies the toes—and I could get pulsation in that as you can in the wrist, but not so strong. Then I went down back at the lower angle of the inner malleolus deep and hard, and I could not find any; there was no pulsation in that artery. I immediately understood then, so far as I could comprehend the situation, why the foot had that peculiar appearance. It was not getting a sufficient amount of blood, and I said to Dr. Haze that I thought the foot was in a dangerous condition, and that, if there could not be some means of instituting a re-establishment of the circulation in that foot, I did not think it would live. Then I examined his heart, and found that decidedly weak; and we talked it over, and I recommended a heart tonic to give more force to the blood. That is all the conversation that I can recall there. The foot and leg were swollen and had a peculiar reddish condition, not a bright red, but a sort of dusky red. And it was swollen quite considerably. And that is another thing that made me think his artery was at fault, because it was the parts of the foot that are supplied by his artery that showed the dark color. On the outside of the foot, along very close to the back of the little toe, running back there, was a dark colored spot. I

cannot remember the size of it now, but it was quite a considerable sized spot, perhaps as big as my index finger all together, and there was some more discoloration. What I mean by discoloration is a darkening of the skin around the inner malleolus, in front and beneath the ankle bone. Then there had been some breaking of the skin just in front of the ankle, and those spots with the uncomfortable appearance of the foot were all that I noticed. The toes and the back part of the foot were the best appearing by all means. By the back of the foot I mean what you call the top of the foot, as on the hand you call it the back of the hand. That had a most healthful appearance, and there was no discoloration of the toes or anything of the sort at the time I saw it, not so much even as there was in some other parts in the foot.

"*Q.* Explain what would cause the front of the foot to look natural and get in the condition you have described, and the other portions of the foot have the nasty appearance that you have described.

"*A.* The way I accounted for it was that this artery on top of the foot was doing some work, taking some blood to the foot, and the parts of the foot that was supplied by that artery were in much better condition than the parts of the foot supplied by the posterior tibial that I could not find. Therefore I attributed the better condition of the top of the foot to the fact that it was getting more nourishment. The place at the front of the foot that I have described was right in front of the ankle joint."

It was one of the undisputed facts in the case that the bones in the foot and ankle became diseased, and that this condition rendered amputation necessary. What caused the bones to become diseased? No one assumed that the known facts which were before the witnesses and the jury led to any certain conclusion. Counsel did not and do not make such an assumption. What was the probable cause of the diseased condition of the bones? This is the precise question to be answered. Plaintiff has proceeded upon the theory that the premises from which the answer of the jury to this question must be given embrace the opinions of persons having extra knowledge. His contention is that it is more probable that the cause was the

treatment received from the defendant. The opinions of those having extra knowledge do not support this contention. It is not enough to show a state of facts equally consistent with unskillfulness and negligence and with skillfulness and due care. *Pelky* v. *Palmer*, 109 Mich. 561, 565 (67 N. W. 561). The opinions of the experts called by plaintiff rest upon observed conditions, none of them disputed, upon an injury and course of treatment unobserved by them, but the details of which were stated to them in accordance with the theory and the testimony of the plaintiff. They decline to express the opinion that it is more probable that the cause of the diseased condition of the bones was the treatment of defendant. They do not disagree with the expert witnesses called by defendant. We are of opinion that the preferred request should have been given.

As the case must go down for a new trial, it is proper to briefly notice some errors assigned upon the conduct of the trial. The hypothetical question put to Dr. Barber embraced not only plaintiff's theory of conditions existing before and at the time the cast was cut, conditions observable by defendant and presumably affecting his judgment, but a statement of subsequent developments and results. His opinion was asked for in these words:

"What would you say, doctor, as to whether the treatment I have described in caring for said leg, ankle, and foot up to the time said cast was opened was proper?"

The various hypotheses are stated in such sequence as to convey the idea that conditions described followed one upon the other. The length of time elapsing between the cutting of the cast and the subsequent discoveries of the real condition of the bones was not stated, nor the time elapsing between the cutting of the cast and the amputation of the limb. Nothing was said concerning the treatment given the limb after defendant was discharged. Opinions of experts are supposed to be based upon hypotheses stated

by counsel. Their value depends upon the truth of the hypotheses stated. The answer to this question was without any value to the jury in determining the question of defendant's responsibility.

As the record is understood, the plaintiff produced in court, but under covering, what were stated to be the bones of the amputated limb, and proposed to exhibit them. There was considerable discussion, in the presence of the jury, concerning the right to exhibit the bones to witnesses and the jury, and the objection to their introduction in evidence was sustained. It is said in the brief for appellant that counsel for plaintiff were enabled to parade the dismembered limb in the presence of the jury and to ask various incompetent and irrelevant questions with respect to it. It is contended that the effect of what was said and done was prejudicial to defendant. As has been stated, we do not understand that the bones were exhibited to the jury, and do understand they remained in the covering or envélope in which they were produced. We are of opinion that they should not have been produced or offered in evidence. It is conceivable that if they were in the same condition they were after the injury, and while defendant was treating the limb, the extent and nature of the various fractures produced by the injury being in question, their examination and perhaps their production in court would have been of value. But plaintiff had proved that various portions of the bones were removed before the amputation took place. He had proved that their condition before and at the time the limb was amputated indicated a gradual and continuing disintegration of the bones from some cause which was active long after the defendant ceased to treat the injury. It could not be apprehended that the jury would be enlightened or instructed by an examination of the remains by themselves or by witnesses in their presence. It is often supposed, and in many cases it is probably true, that a party to litigation is prejudiced in jury trials by

making and insisting upon proper objections to the introduction of evidence. The point is not likely to be presented upon a new trial.

Dr. Shank, a witness produced by defendant, testified that defendant possessed the skill of the average surgeon. On cross-examination he stated, in answer to interrogatories, that he had heard his skill and his own (witness') skill questioned. His examination then proceeded as follows:

"*Q.* Did you know of his treating the Johns girl for a broken limb in which you were called as counsel, living on Hillsdale street?

"*A.* I was called in as counsel by Dr. Haze to see a young lady up there who had a broken leg.

"*Q.* Did you know of his treating a broken leg for Salspaugh?

"*A.* No.

"*Q.* Did you know of his treating John Bohnet?

"*A.* Yes, sir.

"*Q.* Did you know that Dr. Nancrede from Ann Arbor was called?

"*A.* Yes, sir.

"*Q.* Did you know that Dr. Haze was discharged at once and the treatment entirely changed? (Objected to by counsel for defendant, and objection sustained. And thereupon counsel for defendant took exception to the asking of the question as prejudicial before the jury.)

"*Q.* There is but one Nancrede in this State, is there, to your knowledge?

"*A.* But one. A surgeon in the medical department of the University of Michigan."

One who is not possessed of the requisite qualifications of a physician and surgeon cannot be exempted from liability on the ground that his mistake was caused by an error of judgment. But want of requisite qualifications is not shown by proving that he was discharged by a patient and another physician hired who changed the treatment. So much is obvious. We can perceive no purpose in asking these questions, except the one of producing by incompetent means and without tendering the necessary

issue the impression that defendant was lacking in professional skill because he had failed in other cases to satisfy his patients and the physician who succeeded him.

The judgment is reversed, and a new trial granted.

HOOKER, MOORE, MCALVAY, and BROOKE, JJ., concurred.