ROGERS *v.* KEE.

1. PHYSICIANS AND SURGEONS—MALPRACTICE—EVIDENCE.

The evidence being in conflict as to the issue whether plaintiff was, at the time he consulted the defendant, his medical adviser, suffering from a fracture of the femur, the questions of the existence of such fracture and of the physician's care or negligence in diagnosing his injury were for the jury.

2. SAME—NEGLIGENCE—SURGICAL WORK—DIAGNOSIS.

One who employs a physician is entitled to a thorough examination, such as the condition of the patient and circumstances permit, with such diligence and methods of diagnosis for discovering the nature of the ailment as are usually approved and practiced by medical men of ordinary skill and learning in similar localities; defendant's failure to use such skill in discovering the existence of the fracture would be actionable negligence.[1]

3. SAME.

Evidence examined, and *held,* to raise an issue of fact whether the failure of plaintiff's fracture to knit properly was due to the negligence of defendant who diagnosed the trouble successively as sciatica, paralysis, and locomotor ataxia.

4. SAME—ACTIONABLE NEGLIGENCE.

Any want of ordinary care which diminishes the chances of recovery, prolongs the illness, or renders the condition of the patient worse than it would have been if due skill and care had been employed, amounts to an injury recognized by the law.

5. SAME.

And though experts testified that plaintiff, whose leg became shortened and crippled because the fractured bone knit imperfectly, made as satisfactory a recovery as if he had received proper treatment; until the testimony should prove that treatment was useless, the question was one of fact as to defendant's negligence:

---

[1] Degree of care and skill required of physician, see note in 37 L. R. A. 830.

Liability of physician or surgeon for failure to diagnose fracture or dislocation, see note in 28 L. R. A. (N. S.) 136.

6. SAME—CHARGE—INSTRUCTING JURY.
   The court correctly charged the jury that if they found the re-
   sult was all that could reasonably be expected, provided
   proper care had been provided, and the fracture discovered,
   the condition of the hip would not be a basis for damages;
   that defendant could not be held liable for the direct result
   of the original injury; that if they found that the hip was
   not in as good condition as it might be expected to be, under
   reasonable care and proper treatment, and plaintiff experi-
   enced pain or suffering to which he would not have been
   subjected under proper diagnosis, setting, treatment, etc., he
   was entitled to damages therefor.

Error to Delta; Flannigan, J. Submitted April 12,
1912. (Docket No. 40.) Decided July 22, 1912.

Case by Abraham Rogers against David N. Kee for
malpractice. Judgment for plaintiff. Defendant brings
error. Affirmed.

*I. C. Jennings* (*Bowen, Douglas, Eaman & Barbour*,
of counsel), for appellant.

*John E. Tracy* (*P. H. Martin*, of counsel), for appel-
lee.

STEERE, J. This action is brought to recover damages
from defendant, a physician, for alleged malpractice in
neglecting to properly diagnose a fracture of the neck of
the left femur, when professionally called to attend plain-
tiff, and for unskillful and negligent treatment of the
same. Plaintiff recovered a judgment for $1,000 on the
verdict of a jury in the circuit court of Delta county, and
the cause is brought here by defendant on writ of error.

There are 12 assignments of error, only 2 of which are
relied upon and argued by defendant, each presenting
practically the same question, being that the court erred
in refusing to direct a verdict for defendant at the close of
plaintiff's evidence, and again at the conclusion of the in-
troduction of all testimony.

At the time of his injury, plaintiff was 55 years of age,

a saw filer by trade, working in the filing room on the second floor of the sawmill of the Northwestern Cooperage & Lumber Company at Gladstone, Mich. In the forenoon of August 27, 1909, while lifting a circular saw weighing from 130 to 140 pounds from an arbor, and turning to carry it, he felt something give way in his hip, causing him to drop the saw. He soon resumed his work, continuing during the balance of the day, mostly in a sitting posture, and walked home at night on an earth path, a distance of about half a mile, by the aid of sticks used as canes. He continued at his usual work the next day, which was Saturday, and the following Monday, walking to and from the same with some difficulty, using canes, sometimes receiving assistance from others. On Monday evening, August 30th, his condition was such that he called defendant to attend him professionally. Defendant was a regular physician in said city retained by the mill company for which plaintiff worked to professionally care for its employés. Plaintiff informed defendant of the circumstances and nature of his trouble, said he thought it was a bad sprain in the hip, answered whatever questions were asked him by defendant, and submitted his case to him.

The testimony is in conflict as to much of what is claimed to have occurred during this and subsequent visits. Defendant testified that he found no symptoms of a fracture of the femur; that, if there had been any fracture or dislocation of the hip, he made such an examination as would have disclosed it; that, from his examination and the history of the transaction communicated to him by the plaintiff and his wife, he diagnosed the case as sciatica, and prescribed therefor the application of a mustard plaster; that he did not think plaintiff's condition was caused by what occurred at the mill; that, upon visiting the patient the following day, defendant reached the conclusion from his statement that he then had no pain, that the trouble was not sciatica, but more probably paralysis; that he ordered plaintiff to rub the muscles, but

gave him no further treatment at that time because there was nothing further to do except to wait for developments; that he continued his visits for nearly a month, and was still uncertain what ailed plaintiff, but thought he had some spinal trouble and suggestions of locomotor ataxia; that the plaintiff was able to be up and around and walk, though with some difficulty; that he furnished him crutches on which he later visited defendant at his office.

The testimony of plaintiff and his wife was a distinct denial of many of the facts and circumstances related by defendant, their version being that, when first called, defendant, without making any physical examination, at once declared the trouble was sciatica; that plaintiff was lying on the bed at the time, and told defendant of the severe lameness in his hip and the incident in the mill when he first felt the pain; that defendant then indicated on the hip where a mustard plaster should be applied, and left, having remained only about five minutes; that on the following day he made no examination whatever of the hip or leg, and on the fourth day, when he called, finding plaintiff sitting up, asked him to walk, and was informed that he was unable to do so, though with the aid of a chair he crawled to the bed to submit to an examination, when defendant felt of the parts, but made no movement of the limb nor measurements, and said everything was all right; that the hip was then swollen, and defendant gave instructions to massage and rub it with a certain liniment which he prescribed; that this was regularly done by plaintiff's wife, according to instructions, and was very painful; that it hurt to move the limb and defendant was so informed; that the leg became shortened, and plaintiff called defendant's attention to it, who pronounced it simply a temporary contraction of the sciatic cord, and, when asked in regard to consulting a specialist, said it would be useless and throwing money away; that on the eleventh day, without making any further tests, measurements, or diagnoses of any kind, he put plaintiff on

crutches, and directed him to exercise .the limb; that he had plaintiff swing his leg back and forth as much as he could to see what action could · be produced; that after September 29th he entirely ceased to call or pay further attention to the case; that since the occurrence at the mill on August 27, 1909, plaintiff has sustained no fall or stroke upon his hip, or accident of any kind, to which his injury could be attributed; that since that time he has been a cripple, walking with crutches, getting around with difficulty and unable to follow his trade; that he has tried to do so and was employed in a mill for about two months at one time, but had to sit at his work and have a man in attendance to carry the saws to him.

After defendant ceased his visits, plaintiff, on October 25, 1909, consulted Dr. Laing, a physician of Rapid River, Mich., who diagnosed the case and found him suffering from fracture of the neck of the left femur, and dislocation which had not been reduced, and which had existed for some time, a fibrous union having developed. The limb was shortened over two inches, and could be projected backward and forward, but not sidewise. He testifies:

"A fibrous union is a growth practically of flesh between the two joints, the two bones that are separated; that is, preventing the bony matter from uniting. This fibrous union is likely to intervene if you do not get the bones in apposition, or a successful reduction of the fracture. By absorption of bone, or ligamentous union, or fibrous tissue forming between, I would say that very little can be done in a case of a hip joint, especially after 10 or 15 days. This fibrous growth is likely to intervene between the ends of the bones if you do not get a reduction before that time. Of course, it is very important to determine the fact at the earliest possible moment. That is generally recognized among practitioners."

The various physicians who subsequently examined plaintiff and testified as experts in this case confirmed Dr. Laing's diagnosis and statement as to the importance of prompt attention to such cases, and the hopelessness of successful treatment after the lapse of any considerable length of time.

While it is claimed by defendant that plaintiff was not suffering from a fracture of the neck of the femur at the time he first visited him professionally, there was an abundance of· testimony to justify the court in leaving that question to the jury.

This fact being established, there was also abundant evidence to go before the jury on the issue of defendant's negligence in failing to properly diagnose and treat the case, for, on the assumption that plaintiff was suffering from the fracture, as stated, when defendant first visited him professionally, the testimony of physicians called as experts by both sides as to what he could and should have discovered and done is sufficient to raise an issue of fact as to defendant's negligence in failing to properly examine, diagnose, and discover the fracture, in directing the patient to walk and move the broken limb, instead of keeping it quiet in one position, to aid a bony union, and in not informing him as to the nature of the injury, so he would be advised and could co-operate with his physician understandingly in the treatment given. All these issues presented mixed questions of law and fact.

The law is well settled that a patient who employs a physician is entitled to a thorough and careful examination, such as the condition of the patient and circumstances will permit, with such diligence and methods of diagnosis for discovering the nature of the ailment as are usually approved and practiced by medical men of ordinary learning, judgment, and skill, in similar localities. If, by the exercise of such care and skill, the fracture would have been discovered, a failure to properly diagnose is negligence, and it is the duty of a physician, in taking charge of a case where there is a broken limb, to inform and instruct the patient as to his conduct and what caution should be observed in moving or using the limb while it is being treated. The charge of the court was clear and correct upon such questions, and no assignments of error are urged against the instructions, provided the case as a whole could properly be left to the jury.

The serious proposition urged and argued by defendant's counsel is this: Assuming that defendant did or omitted to do all that is claimed by plaintiff, and conceding that the testimony will support the jury in so finding, there is no proof that plaintiff suffered any injury as a result; the testimony, on the contrary, showing as good a recovery as ordinarily obtains under skillful treatment with a patient of plaintiff's age following a fracture of the neck of the femur. In support of this contention, counsel for defendant say in their brief:

"Of the nine physicians who took the stand, all, with the exception of Dr. Axtell as above noted, and one other, Dr. Mitchell, were asked the following question:

"'Would you not say that the plaintiff's limb shows as good results following a fracture of the neck of the femur as would ordinarily be obtained in a patient of his age under skillful treatment?'

"The wording of this question was varied in some instances, but in substance it was the same in every case. Of the seven physicians asked the question, six answered 'Yes.' The other, Dr. Laing, testified that he could not say whether it was or not."

An examination of the record discloses that such answers were given. These answers, standing alone, seem to negative the claim that the condition of plaintiff's limb is attributable to anything defendant did or omitted to do.

That the correct treatment and probable results were scientific questions, is undoubted, and the law seems well settled that malpractice must be substantiated by the testimony of expert witnesses in order to prevail; it being proper for other witnesses to testify as to the treatment and acts of defendant and the province of experts, physicians and surgeons, to say whether or not the same was proper and the probable results. *Wood* v. *Barker,* 49 Mich. 295 (13 N. W. 597); *Spaulding* v. *Bliss,* 83 Mich. 311 (47 N. W. 210); *Farrell* v. *Haze,* 157 Mich. 374 (122 N. W. 197); *Chase* v. *Nelson,* 39 Ill. App. 53; *Ewing* v. *Goode* (C. C.), 78 Fed. 442. It is defendant's

own testimony that he did not diagnose the case as a fractured femur, that such condition did not exist, and he gave no treatment for such an injury. As a result, the questions for the experts resolved themselves largely into the difference between proper treatment and no treatment at all. The allegations relate to offenses of omission rather than commission. We think, however, there is testimony from which injury to some extent might be inferred from the treatment given. Defendant diagnosed the trouble successively as sciatica, paralysis, and locomotor ataxia. So far as he administered any treatment, it was for those maladies. He directed the application of a mustard plaster, and later massage and rubbing the injured hip with a liniment. Plaintiff testifies this was very painful. Pain and suffering from a wrong treatment are an element of damage. He directed plaintiff to walk and exercise the limb. Portions of his own testimony indicate this would be injurious and contrary to a proper treatment. He testifies:

"If I had discovered a fracture of the neck of the femur on my first visit, I would have applied an extension and kept him confined to the bed for some time, if his condition would have allowed it. The purpose of applying the extension would have been to keep the leg from shortening. That is all I could have done; apply an extension and require rest. That is recognized as proper treatment. I would have sent him to bed as long as he could have stood it."

Modifying this later in his testimony, he said, among other things:

"Sending him about on crutches wouldn't aggravate the condition, if he had a fracture, necessarily. Assuming that he did have a fracture at that time, I don't know about it. If he had a fracture, it might possibly aggravate the symptoms. On the other hand, it might be the best possible thing for him. I don't think it would aggravate the symptoms if he moved about with the knowledge that he had a fracture, necessarily. It might be a benefit to him. It would depend on his physical condition. * * * If he was a strong man, he would be better in bed."

Dr. Minahan testified in relation to the plaintiff:

" I observed with reference to this plaintiff, whether or not he appeared to be strong, resolute man or otherwise. He seemed to be very strong."

Counsel for plaintiff do not base their claim on the proposition that he necessarily or probably would have had perfect recovery if properly treated. They say it is based upon the complaint that he unnecessarily "has a wobbly leg, with an extreme degree of mobility in the joint, a leg that pulls several inches each way, in and out of the socket, a useless leg." The exact condition of the leg is not so clear on the record as it apparently was on the trial, where plaintiff was present; and, as indicated by certain questions and answers, there was ocular demonstration of its mobility. Defendant, in reply to a question, says:

" I did see the manner in which plaintiff can project his limb now, pull it out of the socket and set it back. There is mobility there."

Dr. Axtell testifies:

" I found by a radiograph examination that there is no neck of the particular femur under examination. The neck has all been absorbed and gone."

The reply given by the experts, in answer to a leading question, in which they say plaintiff's present condition is as good as they would expect under the best surgical treatment in a man of his age, standing alone, might, perhaps, be construed as meaning that medical attendance in such cases is useless and no benefits from it are to be expected, or that, if plaintiff had been given proper treatment, he would have received no benefits and enjoyed no prospect or probability of being in a better condition; but, in the light of their testimony taken as a whole, we cannot so construe it. They testify that fractures of this nature are serious and difficult to treat, that they are sometimes fatal, that perfect union and complete recovery is not the rule, and is less probable in elderly people; but they do agree

that medical attendance is essential and some treatment should be given to restore the fracture, with a view to getting either a bony or fibrous union.

Dr. Reynolds, a surgeon of 20 years' practice, sworn on behalf of defendant, testifies:

"A fracture of the neck of the femur is an easy matter for a physician to determine, unless it might be a case of impaction. * * * I don't know of any case where I would not apply any treatment at all. * * * The bones of one man at 55 might knit, and the bones of another man at the same age not knit, under precisely the same circumstances, * * * In the absence of a bony union—excluding the question of a bony union—there is a more or less useful cartilaginous union. * * * I would always apply treatment, with some hope of getting some beneficial results, unless I realized that my treatment would prove disastrous to life. * * * And, if you should not succeed in getting a bony union, there is a difference in the value of the fibrous union that you get; that is, some fibrous unions are better than others. * * * The usefulness of your joint depends upon the length of the fibrous tissue. In the event that you have a very small amount of shortening, you will have better results in the fibrous union. You will also have better results where the neck of the femur is not distorted."

Dr. Mitchell, called by the defense, testifies:

"Well, I don't think I would recommend swinging the injured limb or resting the body on the injured limb while up and around. It would retard union. It would aggravate the condition. Produce pain if there was a fracture. Increase the mobility, and render the prospects of having a useful limb very improbable."

Dr. Miller, called also by defendant, testifies:

"I would deem it good practice and advisable to let the injured person know that there was a fracture, and that he should be careful about moving and handling the injured member. * * * We expect to get some results from that treatment that are beneficial, and we hope to get a better joint than we will if you leave the thing to chance, without treatment of any kind. * * * I do not know of any case that we would leave to mere chance;

and not only leave it to mere chance, but leave the patient ignorant of the fact that he had a fracture, in order that he would exercise due caution in regard to his movements. Suppose he did do something that might do harm. It would work harm by increasing the pain and retarding the recovery, possibly prevent a bony union. * * * If we cannot get a bony union, if we do not expect to get a bony union because of age or other conditions, then the endeavor is to get the best cartilaginous union possible."

Dr. Bjorkman, another of defendant's witnesses, testifies:

" I know the method called the ambulatory method. It consists of letting the patient be about, having free use of his limb, so that he may get proper exercise. This treatment may either be carried out by splints or dressings, plaster of paris dressings, or cast, or it may be carried out by simply bandaging the limb and let the leg hang free, or it may be carried out by splints which support the whole limb from the feet, extending above the thigh. * * * And, when we do not use the ambulatory method, we use the extension, so called. The extension method is also a universal method recognized by all physicians and practitioners. We put the patient at rest with a weight attached below his foot. I would apply the extension method so as to overcome the shortening as much as possible, and so as to keep the fragments in apposition as much as possible. I do know of cases where I would not apply either method. It depends upon the age of the person. Take a man who is robust and able to work every day, 55 or 56 years of age, I would apply some one of these methods if I diagnosed the case."

These excerpts illustrate the nature of the testimony given by the various physicians relative to proper treatment of such an injury. Such testimony imports clearly that a patient suffering from such an injury, on calling a physician, is entitled to approved methods of treatment from which experience of the profession indicates beneficial results are probable and to be anticipated; and, if not an entire recovery, a better ultimate condition than if left to chance. If so, can it not be legitimately inferred by a jury that plaintiff, a strong man, who, untreated and with his recovery left to chance, "shows as good results as

would ordinarily obtain in a patient of his age under skillful treatment," if properly and skillfully treated would, in all probability, have a better recovery and be in yet better condition? We think such testimony presents an issue of fact for the jury—on probability, it is true. The issues of sickness and healing, life and death, are too uncertain to be otherwise forecast, but negligence which deprives a man of such probability is more than *injuria sine damno*.

What would constitute an injury to the plaintiff in an action like the present has been thus defined:

"Any want of the proper degree of skill or care which diminishes the chances of the patient's recovery, prolongs his illness, increases his suffering, or, in short, makes his condition worse than it would have been if due skill and care had been used, would, in a legal sense, constitute injury." *Craig* v. *Chambers*, 17 Ohio St. 253.

We think there is testimony in the case, controverted in many essentials it is true, but tending to show that, when defendant was professionally called, plaintiff was suffering from a fracture of the neck of the left femur; that a proper diagnosis would have disclosed it; that defendant made no proper diagnosis, and did not discover it; that the experts agree some approved treatment should be administered to such an injury promptly, delay rendering subsequent efforts futile; that defendant gave no proper treatment; that the treatment he did prescribe was, so far as it had any effect, painful and deterrent; that with the patient quiet and the limb at rest with the broken ends of the bone as nearly as possible in apposition a bony union was possible and a better fibrous union probable; that the patient should be advised and instructed as to the nature of his injury and his movements to avoid interference with the treatment; that defendant did not advise plaintiff of the nature of his injury, did not direct rest and quiet, and confinement to the bed, though plaintiff was a strong man, able to stand it, but allowed and advised him to walk and exercise the limb, tending to work the head of the fractured bone up and down in the muscles of the

hip; that plaintiff's recovery is limited to a poor fibrous union with a loose and mobile joint; that by his erroneous treatment and advice defendant precluded plaintiff from obtaining other medical attendance till it was too late. Until the learned experts testify that no treatment would avail or be beneficial, that no better results are probable with treatment than without—in other words, that a physician is useless in such a case (and they have not so testified here)—we think such facts present an issue for the jury.

The learned circuit judge cautioned the jury that defendant could, under no circumstances, be held responsible for the direct result of the original injury. He further said:

"If you find that the result to the plaintiff's hip as it is here today is all that could reasonably be expected to result under all the circumstances of his case, as disclosed by the evidence here, provided the fracture had been seasonably discovered and properly treated, then the present condition of the hip would not form a basis for any damages in the case. It is reasonable, gentlemen, to say that if the result to the plaintiff today is exactly what it would have been if the defendant had discovered seasonably and properly treated the fracture, that he has sustained no damages on account of the condition of the hip. But, if you find the condition of the hip is not all that could reasonably be expected to follow by reasonable discovery and treatment of the fracture, and if you find that the plaintiff experienced pain, bodily and mental, or either one, or both pain and suffering which he would not have experienced had the fracture been seasonably discovered and properly treated, then you may allow him such sum as you deem just and reasonable in compensation for such pain and suffering, bodily and mental, resulting from the defendant's negligence."

We think the case was properly submitted to the jury under a clear and correct charge.

The judgment is affirmed.

MOORE, C. J., and MCALVAY, BROOKE, STONE, and OSTRANDER, JJ., concurred. BLAIR and BIRD, JJ., did not sit.