LOUDON ET AL., APPELLANTS, *v.* SCOTT ET AL., RESPONDENTS.

(No. 4,232.)

(Submitted November 19, 1920. Decided December 13, 1920.)

[194 Pac. 488.]

*Physicians and Surgeons—Malpractice—Negligence—Gist of Action—Evidence—Insufficiency—Presumptions—Burden of Proof.*

Trial—Nonsuit—Rule.
　　1. A case should never be withdrawn from the jury, unless it appears as a matter of law that a recovery cannot be had upon any view of the facts which the evidence reasonably tends to establish; but, whenever there is no evidence in support of plaintiff's case, or the evidence is so unsubstantial that the court would feel compelled to set aside a verdict, if one should be rendered for plaintiff, a nonsuit should be granted.

---

　Degree of care and skill required of physicians and surgeons, see notes in 1 Ann. Cas. 306; 14 Ann. Cas. 605; 93 Am. St. Rep. 657.

Physicians and ·Surgeons—Malpractice—Gist of Action.

    2. A physician is not an insurer, and a malpractice case does not differ in its essential ingredients from any other action for damages arising from negligence; the gist of the action being negligence, and actionable negligence arises only from a breach of legal duty.

Same—Extent of Duty Toward Patient.

    3. A physician assumes toward his patient the obligation to exercise such reasonable care and skill as is usually exercised by physicians or surgeons of good standing of the same system or school of practice in the community in which he resides, having due regard to the condition of medical or surgical science at that time.

Same—Malpractice—When Expert Testimony Necessary.

    4. *Held*, that expert medical testimony was necessary to determine the question whether a physician, in administering an anesthetic to his patient at a time when the latter showed the effects of drinking intoxicating liquor, was wanting in the exercise of ordinary care and skill which the law requires.

Same—Negligence—Evidence—Admission.

    5. The statement of a physician that he knew it was dangerous to administer an anesthetic to an intoxicated patient, but because of his knowledge of patient's physical condition he felt justified in proceeding, was not an admission that the treatment did not conform to requirements of good surgery, nor indicated want of care, skill, ability or diligence.

Same—Negligence in Administering Anesthetic—Presumptions.

    6. Since the evidence disclosed that the element of danger is present in every instance where a patient is anesthetized, negligence could not be presumed from the fact that it was dangerous to administer the anesthetic before he had entirely recovered from overindulgence in strong drink or from the fact that he died shortly thereafter.

Same—*Res Ipsa Loquitur*—Inapplicability of Doctrine.

    7. The doctrine of *res ipsa loquitur* has no application to a malpractice case.

Negligence—Presumptions.

    8. Negligence is not to be presumed, but must be proven.

Physicians and Surgeons—Malpractice—Burden of Proof.

    9. In an action for damages against a physician for negligently causing the death of a patient, plaintiff had the burden of proving negligence in the particular charged and that death resulted proximately from such negligence.

Same—Error of Judgment—Damages—Non-liability.

    10. For an error of judgment by a physician of requisite learning, skill and ability, in the treatment of a patient, he cannot be held responsible in damages.

Same—Presumptions.

    11. There is no presumption that a physician has authority to detain a patient in a hospital a sufficient length of time to enable him to recover from the effects of intoxication before undergoing an operation, any more than that he may operate upon him without his consent.

    *Appeal from District Court, Silver Bow County; J. J. Lynch, Judge.*

ACTION by Olive Loudon and Rachael Loudon, a minor, by Olive Loudon, her guardian *ad litem,* against Drs. M. J. Scott and Frederick J. Langdon. From a judgment for defendants, and an order denying a new trial, plaintiffs appeal. Affirmed.

*Mr. J. O. Davies,* for Appellants, submitted a brief, and argued the cause orally.

The principles of law governing the conduct of a physician and surgeon and the care they must exercise in treating a patient are well established, and among those principles are the following: That the physician or surgeon, in treating a patient, must at least bring into use and use that degree of professional skill which he himself possesses; that is, in treating a patient, the physician or surgeon, if he knows a safe method of treating, he must use the safe method. He cannot ignore the safe method which he knows and adopt a method which he knows to be dangerous to the life of his patient. In other words, the physician or surgeon has no license under the law to knowingly take chances on the life of human beings and escape the charge of negligence any more than any other person. This principle of law is gone into very thoroughly and with great painstaking by Justice Jaggard, a distinguished jurist of Minnesota, in the case of *Staloch* v. *Holm,* 100 Minn. 276, 9 L. R. A. (n. s.) 712, 111 N. W. 264. He devotes several pages of the opinion for discussion of this question and repeatedly lays down the principles above mentioned. In the case of *Harris* v. *Fall,* 177 Fed. 79, 27 L. R. A. (n. s.) 1174, 100 C. C. A. 497, the court uses the following language: "In undertaking this professional work the obligation was incurred by Dr. Harris to exercise throughout the performance of his engagement both the ordinary care and skill of his profession in the light of modern advancement and learning on the subject and his own best ability, skill and care." This principle of law is so reasonable, sound and fundamental that we do not believe that it would be or could be disputed, even though no authorities whatever could be found to support it. It is only the application to physicians of the well-known principle of law laid down, we might say, in thousands of cases

which is to the effect that where there is a safe and dangerous way of performing an act or executing an undertaking, any person performing that act or executing the undertaking who knowingly adopts the dangerous way or method and brings injury upon himself or another, is charged as a matter of law with negligence, approximately causing such injury. (5 Thompson on Negligence, sec. 5372; 3 Labatt on Master and Servant, 2d ed., sec. 1219.) Keeping in mind this simple basic and fundamental principle of law, appellants contend that the record of this case establishes as complete a case of negligence against defendant Scott as has ever been established in any court.

*Messrs. Walker & Walker* and *Messrs. Kremer, Sanders & Kremer,* for Respondent, submitted a brief; *Mr. Thos. J. Walker* and *Mr. Alf. C. Kremer* argued the cause orally.

This is an action for malpractice, and in such actions there can be no recovery without expert medical testimony to show lack of requisite skill and care on the part of the defendant. (*Miller* v. *Toles,* 183 Mich. 252, L. R. A. 1915C, 595, 150 N. W. 118; *McGraw* v. *Kerr,* 23 Colo. App. 163, 128 Pac. 870; *Ewing* v. *Goode,* 78 Fed. 442; *Ball* v. *Skinner,* 134 Iowa, 298, 111 N. W. 1022; *Zoterell* v. *Repp,* 187 Mich. 319, 153 N. W. 692; *Sheldon* v. *Wright,* 80 Vt. 298, 67 Atl. 807; *Wilkins' Admr.* v. *Brock,* 81 Vt. 332, 70 Atl. 572.)

To establish negligence against the defendant Scott it was necessary that the plaintiff prove that he failed to exercise such reasonable skill and attention in the treatment afforded deceased as that employed in this and similar localities by physicians and surgeons exercising reasonable care and skill. "A physician is not chargeable with negligence for failure to use his best skill and ability if he uses the care and skill which are exercised generally by physicians of ordinary care and skill in similar communities." (*Dorris* v. *Warford,* 124 Ky. 768, 14 Ann. Cas. 602, 9 L. R. A. (n. s.) 1090, 100 S. W. 312.) This is the basic law in all cases of malpractice. (*Pelky* v. *Palmer,* 109 Mich. 561, 67 N. W. 561, 3 Det. L. N. 198; *Carpenter* v. *Blake,* 10 Hun (N. Y.), 358, 359; *Whitesell*

v. *Hill,* 101 Iowa, 629, 37 L. R. A. 830, 70 N. W. 750; *Force*
v. *Gregory,* 63 Conn. 167, 38 Am. St. Rep. 371, 22 L. R. A.
343, 27 Atl. 1116; *Hathorn* v. *Richmond,* 48 Vt. 557; *Gates* v.
*Fleischer,* 67 Wis. 504, 30 N. W. 674; *Nelson* v. *Harrington,*
72 Wis. 591, 7 Am. St. Rep. 900, 1 L. R. A. 719, 40 N. W.
228.)

There is the statement of Dr. Scott to the effect that had
he confined the deceased to the hospital and prevented him
from obtaining alcoholic stimulants, and had he not attempted
to operate at the time he did, the deceased would have had
a greater chance for recovery. But this is not evidence of
negligence. The fact that the deceased was not detained in
the hospital for such a length of time as to eliminate all
traces of alcohol can only be construed as an error in judg-
ment upon the part of Dr. Scott, and for such an error in
judgment an action for malpractice will not lie. (*Spain* v.
*Burch,* 169 Mo. App. 94, 154 S. W. 172; *Leighton* v. *Sargent,*
27 N. H. 460, 59 Am. Dec. 388; *Becker* v. *Janinski,* 27 Abb.
N. C. (N. Y.) 45, 15 N. Y. Supp. 675.)

"While the responsibility of the medical practitioner and
surgeon is great and care appropriate should be observed in
the exercise of his professional employment when his errors
are those of judgment only, if he keeps within recognized and
approved methods, he is not liable for their consequences."
(*Wells* v. *World's Dispensary Medical Assn.,* 45 Hun, 588,
9 N. Y. St. Rep. 452; *Dorris* v. *Warford,* 124 Ky. 768, 14 Ann.
Cas. 602, 9 L. R. A. (n. s.) 1090, 100 S. W. 312; *Nickerson*
v. *Gerrish,* 114 Me. 354, 96 Atl. 235; *Fisher* v. *Niccolls,* 2 Ill.
App. 484.)

"One of two physicians separately employed who under-
takes to administer the anesthetic while the other performs
an operation is not liable for the other's negligence and mal-
practice in doing the work if he has no actual knowledge of
it." (*Morey* v. *Thybo,* 199 Fed. 760, 118 C. C. A. 198, note
in 42 L. R. A. (n. s.) 483, and cases cited; *Stokes* v. *Long,* 52
Mont. 470, 482, 159 Pac. 28; *Reynolds* v. *Smith,* 148 Iowa,
264, 127 N. W. 192; *Myers* v. *Holborn,* 58 N. J. L. 193, 55
Am. St. Rep. 606, 30 L. R. A. 345, 33 Atl. 389.)

MR. JUSTICE HOLLOWAY delivered the opinion of the court.

On July 18, 1914, Dr. M. J. Scott caused an anesthetic to be administered to Charles Loudon, preparatory to performing a surgical operation. Loudon died from the effects of the anesthetic before the operation was commenced, and this action was thereafter instituted to recover damages for malpractice. Issues were joined and the cause was brought to trial. At the close of plaintiffs' case the court granted a nonsuit, and ordered judgment dismissing the complaint. From that judgment, and from an order denying a new trial, plaintiffs appealed.

The surgeon is charged with negligence (1) in causing the anesthetic to be administered at the particular time, when the patient was in an unfit physical condition, and (2) in the manner in which it was administered; but there was not any attempt made to prove the second charge, and we may presume that it was abandoned.

Mrs. Loudon testified that a few days after Loudon's death she went to Dr. Scott to procure a certificate of death to be used by her in the settlement of some insurance claim, and that Dr. Scott then told her that death was not caused by the injury which Loudon had received on June 4, but was produced by the shock of the anesthetic administered while Loudon was "in an intoxicated condition and suffering from acute alcoholism"; that she asked him why he gave Loudon the anesthetic while he was in that condition, and he replied that he knew it was dangerous, but that Loudon was a strong, healthy man, and he thought he could stand it. Mrs. Loudon also testified: "My husband was a strong, healthy man, being five feet eleven inches tall, and weighed about 175 pounds; his normal weight being about 200, 210, or 214, something like that. * * * I don't know anything about Mr. Loudon drinking for the last three weeks before his death; I never saw him drunk. * * * Prior to the time Mr. Loudon received this injury, he was a sober man, and worked daytime; worked steadily; didn't lose any time." A witness, Connors, testified

he was with Loudon on the afternoon of July 17; that Loudon was then "under the influence of liquor." This was immediately before Loudon went to the hospital.

In addition to the foregoing, there was introduced, on behalf of the plaintiffs, the testimony which Dr. Scott had given upon the trial of two other cases, which testimony may be summarized briefly as follows: On June 4, 1914, Charles Loudon was taken to St. James Hospital suffering from a comminuted fracture of both bones of the right forearm, sustained while working in one of the mines in Butte. Dr. Scott took charge of the case, applied temporary bandages and dressings, and later had an X-ray picture taken, and determined that a surgical operation would be necessary as soon as the swelling in the arm receded and the soreness disappeared sufficiently to admit of it, which would require from three to four weeks. Loudon returned to the hospital frequently to have the dressing changed, and at the expiration of about four weeks Dr. Scott observed that he was indulging in intoxicating liquors to excess and admonished him to desist, which he promised to do, but did not do. An appointment was made for a definite time for the operation, but when the time arrived Loudon presented himself in an intoxicated condition, and was sent home with the warning that he must desist from the use of intoxicants in order that the operation might be performed and his arm saved from uselessness. Another appointment was made, but again Loudon appeared at the hospital intoxicated, and again he was sent home with the like admonition. Whether he was sent home a third time is not made certain. During the two or three weeks which intervened after Dr. Scott discovered that he was drinking to excess, Loudon had suffered from acute alcoholism, and did not stop the use of intoxicants until the afternoon of July 17, when he appeared at the hospital "more sober than he had been, but he showed the effects of drinking," and, accepting the advice of Dr. Scott, stayed there overnight during which time the doctor got him in as good condition as he could under the circumstances. The operation had been delayed then two or three weeks, solely on account of Loudon's intemperance.

On the morning of July 18, Dr. Langdon and Dr. Murphy prepared the patient for Dr. Scott to operate upon, and to that end administered to him an anesthetic. The doctors discovered presently that Loudon was not progressing favorably, and they undertook to restore him, but without avail. He had convulsions, with some of the characteristics of an alcoholic fit, and died within twenty minutes.

The operation which Dr. Scott was about to perform was necessary to prevent the arm becoming useless, and, in order to perform it, it was necessary that the patient be given an anesthetic. The effect of Loudon's drinking was to weaken his heart action, lower his vitality, and make it much more dangerous to administer the anesthetic to him. The cause of death was "the shock from the anesthetic, plus his condition." If he had refrained from the use of intoxicants to excess, his chances of recovery would have been better, but he still would have had to take one chance in from 2,000 to 5,000 as everyone does who takes an anesthetic. Dr. Scott also testified: "I had sole charge of Mr. Loudon. A doctor knows when it is safe to put a man on the operating-table."

This is substantially an epitome of the evidence so far as it reflects upon the question of negligence.

Counsel for appellants in his brief makes the statement that Dr. Scott also testified that he could have placed Loudon in the hospital at any time he desired and removed the condition which caused his death. By this we presume that counsel contends that Dr. Scott testified that he could have kept Loudon in the hospital a sufficient length of time to remove the effects of his intemperance sufficiently to make the administration of the anesthetic a safer operation. But the record, which is cited by counsel, does not justify the statement. It discloses that a question was propounded to Dr. Scott, evidently intended to elicit information of that character; that an objection was interposed and sustained, and this question was then asked and answered: "Q. Why didn't you keep him in the hospital and take charge of the case until such time as the conditions were favorable for operating on him? A. We did have him in one time, and he wanted to go home, and there

was no objection in his condition to his going home; there was nothing in his condition, in his injury or his condition, that would prevent his going home; he wanted to go home. As to his condition of intoxication when he came to the hospital, he was not what would be called paralyzed drunk. He had been drinking sufficiently that his breath showed very badly that he had been drinking; his face showed it; his face continued flush; and his talk showed it. He was a little bit unsteady, but not so that he couldn't walk. One could remove most of that condition probably in twenty-four hours." Whether this statement relates to Loudon's visit to the hospital on July 17, to some prior visit, or to his visits generally during the last two or three weeks of his life, is left to conjecture.

It is the rule in this jurisdiction that a case should never [1] be withdrawn from the jury unless it appears as a matter of law that a recovery cannot be had upon any view of the facts which the evidence reasonably tends to establish (*Stewart* v. *Stone & Webster Eng. Corp.*, 44 Mont. 160, 119 Pac. 568); but whenever there is not any evidence in support of plaintiff's case, or the evidence is so unsubstantial that the court would feel compelled to set aside a verdict, if one should be returned for plaintiff, a nonsuit should be granted. (*Escallier* v. *Great Northern Ry. Co.*, 46 Mont. 238, Ann. Cas. 1914B, 468, 127 Pac. 458.)

Does this evidence, viewed in the light most favorable to plaintiffs, reasonably tend to establish the negligence charged against Dr. Scott?

The consensual transaction from which arises the relation of physician and patient does not imply absolute liability. [2] A physician is not an insurer, and a malpractice case does not differ in its essential ingredients from any other action for damages arising from negligence. The law does not presuppose that for every injury there must be a recovery in damages. The gist of this action is negligence, and actionable negligence arises only from a breach of legal duty. (*Jonosky* . v. *Northern Pac. Ry. Co.*, 57 Mont. 63, 187 Pac. 1014.)

What, then, was the legal duty which Dr. Scott owed to
[3] Charles Loudon? In *Hansen* v. *Pock,* 57 Mont. 51, 187
Pac. 282, this court said: "It is the rule, recognized by the
courts generally, that when one holds himself out as a physi-
cian or surgeon, whether licensed or not, and accepts employ-
ment as such to treat a patient, he assumes toward the patient
the obligation to exercise such reasonable care and skill in that
behalf as is usually exercised by physicians or surgeons of
good standing, of the same system or school of practice in the
community in which he resides, having due regard to the con-
dition of medical or surgical science at that time."

The same rule is expressed in somewhat different terms by
the supreme court of New York, in *MacKenzie* v. *Carman,* 103
App. Div. 246, 92 N. Y. Supp. 1063, as follows: "The law
thus requires a surgeon to possess the skill and learning which
is possessed by the average member of the medical profession
in good standing, and to apply that skill and learning with
ordinary and reasonable care. He is not liable for a mere
error of judgment, provided he does what he thinks is best
after a careful examination. He does not guarantee a good
result, but he promises by implication to use the skill and
learning of the average physician, to exercise reasonable care,
and to exert his best judgment in the effort to bring about
a good result." That language is quoted approvingly in *Staloch*
v. *Holm,* 100 Minn. 276, 9 L. R. A. (n. s.) 712, 111 N. W. 264,
and in *McAlinden* v. *St. Marie's Hospital Assn.,* 28 Idaho,
657, Ann. Cas. 1918A, 380, 156 Pac. 115. To the same effect
is the text in 21 R. C. L. 381, and 30 Cyc. 1570. (See, also,
*Pike* v. *Honsinger,* 155 N. Y. 201, 63 Am. St. Rep. 655, 49
N. E. 769.)

Isolated cases may be found in which loose language is em-
ployed to the effect that the physician owes to the patient the
duty to exercise his best care, skill and ability; but the doc-
trine is as illogical as the practical application of the rule
would be ridiculous. As said by the Kentucky court of ap-
peals in *Dorris* v. *Warford,* 124 Ky. 768, 14 Ann. Cas. 602,
9 L. R. A. (n. s.) 1090, 100 S. W. 312. "No man is always
at his best. One who employs a professional man may expect

from him the ordinary care and skill of his profession. He is liable if he does not give this, but more cannot be demanded. If the physician is responsible in any case where he does not exercise his best skill and ability, then it will be a material inquiry, and evidence may be offered to show what is his best skill and ability. This would be to introduce into the case a new and confusing issue, which has never been allowed. When a person employs a physician, the law implies an agreement on his part to exercise the ordinary care and skill of the profession. The implied contract goes no further, and there is no liability on his part if the implied contract has not been broken. Were it otherwise, there would be no fixed rule in cases of this sort, and in every case the result would depend, not on the contract implied by law between the parties, but on the proof in that case as to the skill and ability of the physician. It is no defense to the physician that he used his best skill and ability if he fell short of the legal standard, and there is no liability on his part if his care and skill come up to the legal standard.''

The object of the law on the one hand is to guard the patient against the wrongful practice of ignorant or negligent men who hold themselves out as physicians or surgeons, and on the other to protect the faithful practitioner of ordinary learning, skill and ability from loss in reputation or purse on account of matters for which it would be unreasonable to hold him responsible. (*Heath* v. *Glisan,* 3 Or. 64.)

Having determined the standard of legal duty, there remains but the inquiry: In what respect, if at all, did Dr. Scott fail to measure up to that standard? What did he do or fail to do that was not consonant with good practice or approved surgery? There is not even a suggestion in the evidence that he did not possess that reasonable degree of learning and skill which was ordinarily possessed by the members of his profession in good standing in the locality where he practiced; but it is contended that he did not use reasonable care and diligence in the exercise of his skill and the application of his learning to accomplish the purpose of his employment.

There is not any controversy in the evidence which tends to prove the condition of the patient prior to his injury on June 4, the character and extent of his injury, the method of treatment adopted, the instructions given to the patient, the conduct and condition of the patient during the six weeks preceding July 18 and on that date, and the result which [4] followed the administration of the anesthetic; but there was not any expert testimony to the 'effect that, upon these admitted facts, the action of Dr. Scott in causing the anesthetic to be administered to Loudon on July 18 indicated the exercise or want of ordinary care, skill or diligence, as is required in malpractice cases in this jurisdiction and elsewhere generally. (*Stevenson* v. *Gelsthorpe*, 10 Mont. 563, 27 Pac. 404; *Schumacher* v. *Murray Hospital, ante,* p. 447, 193 Pac. 397; 1 Witthaus & Becker on Medical Jurisprudence, 87.)

But it is the contention of appellants that they met the [5] requirements of the rule fully by introducing the admissions made by Dr. Scott, to the effect that he knew that Loudon's intemperance had reduced his vitality and greatly increased the danger incident to the administration of an anesthetic, and that he knew it was dangerous to cause the anesthetic to be administered to Loudon on July 18, but because of his knowledge of the patient's physical condition he felt justified in proceeding at that time. That this does not amount to an opinion or admission that the treatment—the administration of the anesthetic under the circumstances— was not in conformity to the requirements of good surgery, or indicated a want of ordinary care, skill, ability or diligence, [6] is so obvious as to require no comment. No presumption of negligence arises from the fact that it was dangerous to administer the anesthetic to Loudon on July 18, for the evidence discloses that the element of danger is present in every instance where a patient is anesthetized.

The gravamen of this case is negligence, and negligence cannot be inferred from the fact alone that the patient died. (*Haire* v. *Reese*, 7 Phila. (Pa.) 138; *Bonnet* v. *Foote*, 47 Colo. [7–9] 282, 28 L. R. A. (n. s.) 136, 107 Pac. 252.) The maxim,

"*Res ipsa loquitur,*" has no application to a case of this character. (*Ewing* v. *Goode* (C. C.), 78 Fed. 442.) Negligence is not to be presumed; it must be proved (*Reino* v. *Montana M. L. Co.,* 38 Mont. 291, 99 Pac. 853), and plaintiffs were required to assume the burden. of proving the negligence charged and that Loudon's death resulted proximately from such negligence (3 Wharton's & Stille's Medical Jurisprudence, sec. 500). From the very nature of the case, each of these ultimate facts required for its proof the testimony of one qualified to give an expert opinion (*Pettigrew* v. *Lewis,* 46 Kan. 78, 26 Pac. 452), and in the absence of such testimony the case failed.

It is not difficult to understand why expert testimony was [10] not introduced. The subject matter does not admit of it. The case made is one wherein the question whether the operation should have. been undertaken on July 18 was addressed exclusively to the sound judgment of the surgeon in charge. In the absence of evidence to the contrary, we must assume that Dr. Scott possessed the requisite learning, skill and ability. There is no charge made that he was remiss in failing to collect all the data essential to an intelligent judgment. On the contrary, it appears that he knew the patient's history during the preceding six weeks at least; that he knew that Loudon was a strong, robust man of middle age; that he knew the fact, extent and effect of· Loudon's intemperance, and for what length of time he had refrained from the use of alcoholic intoxicants; that he knew the character and extent of Loudon's injury, and the effect which it had upon his system; and with all this knowledge, available to draw upon, he determined that the patient could withstand the shock of the anesthetic on the morning of July 18. There is nothing in the record to suggest an impeachment of his good faith; on the contrary, the evidence leads to but one conclusion: That Dr. Scott exercised a *bona fide* judgment, and if, under the circumstances, an error was committed—and the evidence does not warrant such an assumption—it was merely an error of judgment for which he cannot be held respon-

sible in damages. (*Jackson* v. *Burnham,* 20 Colo. 532, 39 Pac. 577; *Dye* v. *Corbin,* 59 W. Va. 266, 53 S. E. 147.) Upon a somewhat similar state of facts the same conclusion was reached in *Staloch* v. *Holm,* above, and in *Wood* v. *Wyeth,* 106 App. Div. 21, 94 N. Y. Supp. 360.

It is suggested in the brief of counsel for appellants that [11] Dr. Scott could have detained Loudon in the hospital a sufficient length of time to remove the effects of his intemperance, and that there was not present any emergency which compelled the operation at the particular time it was undertaken. There is not any evidence to justify either assertion, and certainly there is not any presumption that a physician has authority to detain his patient against the patient's will, any more than that he may operate upon the patient without patient's consent. Whether the operation could have been performed as well at a later date is left to conjecture. If the operation had been postponed longer, and serious results had followed to Loudon's arm, Dr. Scott might have been called upon to respond in damages for his negligence in failing to operate at the proper time.

The evidence is not sufficient to carry the case to the jury, and the trial court properly so ruled.

The judgment and order are affirmed.

*Affirmed.*

MR. CHIEF JUSTICE BRANTLY and ASSOCIATE JUSTICES HURLY, MATTHEWS and COOPER concur.