## Meador v. Arnold.
(Decided Feb. 25, 1936.)

FRANK A. ROPKE, THOMAS A. BALLANTINE, and W. S. HEIDENBERG for appellant.

L. R. CURTIS for appellee.

OPINION OF THE COURT BY JUDGE RICHARDSON—Affirming.

This is an action to recover damages for malpractice. The propriety of the court directing a verdict for the defendant is the perplexing question to be considered.

To review the action of the court, and consider and determine the correctness of his ruling, require a review of the pleadings and evidence. The petition, after setting out Dr. Arnold's employment to perform a hip operation for which no recovery herein was sought, and of which no criticism is now made, charges that within a few days after the operation, Anna Meador suffered intense pain in her abdomen and suggested to Dr. Arnold that the peg used by him in the hip operation had slipped into her abdomen when he assured her it was impossible and could not happen, and that he "negligently and carelessly refused and failed to make a proper examination of the plaintiff to ascertain whether or not the peg had slipped and entered her abdomen;" she continued to suffer excruciating pains and her bladder became infected, of which she made complaint to him, and that he "negligently and carelessly failed to make an examination." And in April, 1934, while she was suffering extreme pain, he finally suggested that

she be removed to the Norton Infirmary for observation and an X-ray examination, which was accordingly done, and the examination then disclosed "the peg aforementioned had penetrated her bladder," and that on the 18th day of April, 1934, it was removed; it was the same peg or pin that he had placed in her broken bone. She charged that it was wood, 5½ inches long by one-half inch wide and one-half inch thick, and when removed from her bladder had "a large stone formed around the center thereof." The petition was traversed by an answer. At the conclusion of her evidence the court directed a verdict for Dr. Arnold. The evidence introduced to establish her cause of action is substantially as follows:

Anna Meador, a maiden lady, age 55, on the 9th day of October, 1933, in a fall at her home, sustained a broken hip. The family physician, Dr. C. O. Tydings, was called immediately. A day or two thereafter, he diagnosed her injury to be a fractured hip and suggested that Dr. I. A. Arnold, a bone specialist, be called. He was called, and an X-ray examination developed that she had sustained "an intracapsular fracture of the left femur." At the latter's suggestion she was removed to the Norton Infirmary, on October 16, 1933, where he performed what is known as "an open bone operation." This operation required an opening up of the thigh to the bone; the drilling through the neck of the femur, and after the broken bone was set, a bone peg about five inches long and from one to five-sixteenths of an inch in circumference was driven into this opening to hold the broken bone in position. An infection later manifested itself in the injured hip which was drained by the method adopted and used by Dr. Arnold. Within a short time she had an enormous distension of the abdomen, "a fecal mass." Dr. Arnold thoroughly examined her about the sixteenth day after the operation to determine what the abdominal trouble was and the reason for it, when the "mass" was discovered. Dr. Tydings was of the opinion that she had "malignancy of the colon." Dr. Arnold informed him that on account of the condition of her hip, if the condition was malignant, she could not be disturbed. Dr. Tydings put her on a special treatment and in a few weeks the distension disappeared. About February following the operation, the patient complained of a burn-

ing of the bladder. Dr. Tydings was again called by the family and prescribed for her. She slightly improved and a urinalysis by him showed alkaline urine and some pus, for which he treated her. About April 1st, he informed Dr. Arnold the patient was not getting any better under ordinary treatment for cystitis. Dr. Arnold directed him to let her have another examination of the urine which, on being made, showed blood and pus in great quantities. On the next day Dr. Arnold advised a vaginal examination to see what could be detected, and upon this examination it was found there was a mass in the region of the bladder. It appears that the patient, about the 19th day of December, following "the open bone operation," experienced bleeding of the bladder "sufficient to be noticeable to the naked eye of a layman." However, her physical condition improved, which demonstrated the loss of but little blood, if any. Dr. Arnold did not direct Tydings in his treatment, except to advise with him and express his opinion. A slight bleeding of the bladder continued for about two weeks, then ceased. The patient suffered intense pain and excessive, frequent urination. Dr. Arnold examined the abdomen and looked over the patient on each of his visits; in all, he visited her 73 or 74 times. On April 14, 1934, at his suggestion, Dr. Owsley Grant, a specialist (a urologist), was called. Dr. Grant's X-ray examination disclosed that the bone peg had migrated from its position in the hip bone, passing through the intervening tissue of the patient's body, into the bladder. It traveled from the point where it was placed in the thigh bone, about six or seven inches to the farthest extended point of the bladder. The back end of it had already gotten entirely out of the hip bone, into the bladder. The place of exit from the tissue and of its entry into the bladder had walled off by a multiplication of the tissue. It was removed by an abdominal operation which was followed by an immediate complete recovery of the patient.

Dr. Grant delivered this peg to the American Urological Association "to show this very rare and unusual evidence of a foreign body in the bladder." He stated: "There is no report in medical literature of such a happening," known to him. When the patient was first examined by him with a cystoscope, it was his opinion "it was an incrustation of the bladder, which might, itself,

have been a loose stone, which very frequently occurs on a growth in the bladder.''

He was asked and answered thuswise:

"Q. Suppose you took the X-ray thirty days before you did and found that the end of the bone was protruding through the hip bone, would you have removed it at that time? A. No, sir.

"Q. Why? A. Because if it was protruding through the bone there would be no way to get it out except by cutting the bone.

"Q. Would or not that operation have been advisable? A. No, sir, it would not. I would not have done it.

"Q. Why? A. * * * If it was still in the head of the femur it would not have reached the bladder. It must be free from the bone before it can reach the bladder.''

At the time he removed the peg from the bladder, a protecting wall around it on the outside of the bladder had been formed by a multiplication of the tissue. That prevented any leakage occurring from the bladder after it had perforated into the soft tissue which lies in this portion of the pelvis. This protecting wall prevented the escape of the urine into the soft tissue. He was further asked and answered:

"Q. Would not it have been the proper practice to remove the peg even if you had found it before nature built up that wall? A. No sir; it would not, but it would have meant a very violent sepsis— blood poisoning. * * *

"Q. Even if Dr. Arnold had taken an X-ray at any time before your X-ray was taken and found the peg in a different position, you don't say he did anything wrong by leaving it in there? A. Well, if it showed in the position in which I saw it, I think it was advisable to take it out. * * *

"Q. Is it usual and customary for one of your profession, or one of Dr. Arnold's profession, an orthopedic surgeon, if you know, if he discovers that blood is coming from the bladder continuously for approximately two weeks to do anything more

than to treat the bladder in the usual and ordinary way, such as a general practitioner would do? A. I regret to say it is not.

"Q. Or is it customary or usual to take an X-ray to find out especially when the bladder is being treated by a family physician? A. No, sir.

"Q. Or to send the patient to a bladder specialist? A. No, sir."

Dr. Grant, in response to a hypothetical question embracing the relative facts developed by the testimony in behalf of Anna Meador, responded in this language:

"The only answer that I could make to that would be that there would be so many other factors involved in a case of this kind, a woman of this age, incapacitated apparently, difficult to examine, that it would seem to me the only satisfactory determination would have to be made by the individual who was seeing the patient at that time. There are possibilities unlimited as to the other things which might have been involved about her; as to whether this infection was the result of some pre-existing disease in this patient, whether she had some peculiar changes in the bone, what reaction her blood had shown to the infection—they are too innumerable for it to be answered 'yes' or 'no' by a hypothetical case of that kind."

Following this he was asked and answered these questions:

"Q. Do you always in your specialty take an X-ray or use a cystoscope when you first discover blood passing in the bladder? A. Not always, no.

"Q. Does that or not depend upon conditions and upon a great number of things? A. Yes, sir."

A sister of Miss Meador detailed the suffering endured by the patient, the passage of blood with the evacuation of her kidneys, and the distended condition of the abdomen. She narrated conversations with Dr. Arnold concerning her opinion that the bone peg had entered the abdominal cavity and perhaps the bladder, and her insistence that he examine the patient to determine whether the bone peg was the cause of the trouble, and his declining to comply with her request.

Dr. R. N. Holbrook, a general practitioner, and not a specialist, testified that patients and their friends are always solicitous about the patient's welfare and they sometimes suggest some rather absurd things, and the fact that the sister suggested that to a bone surgeon who never had this to happen before, he may well have been inclined to ignore the suggestion. He expressed the opinion that the presence of the bone peg in the abdomen or the bladder could, and would, have been discovered by an X-ray examination of the patient. Such examination could have been made with a portable X-ray instrument at the home of the patient. Also, that a digital or vaginal examination could have been made of the patient, but the rule was, "if there is anything about the condition of the hip that would make it inadvisable at the time to make a vaginal examination, why, then we would have to forego that." In answer to numerous questions propounded to him, Dr. Holbrook responded: "You ask me questions that I am not competent to answer." He was asked this question:

"Q. You can't tell the jury and you won't tell the jury whether or not if you had been in Dr. Arnold's place, whether you would have done any more than he did; that is right, is it not? A. I could not truthfully say what I would have done because as I have said I am not a bone surgeon. I might have an opinion what I would have done in regard to the bladder under ordinary circumstances, but that would have to be modified—my opinion would be modified by the condition of the bone [in the hip], and I would have to depend upon some one with more experience than I have to answer those questions."

Dr. Arnold was called as a witness in behalf of the plaintiff and stated in detail his administration to the patient from the moment he was called until the abdominal operation was completed by Dr. Grant. He stated that:

"The fact this woman had a broken hip, I did not want to disturb it any more than possible; the fact she was highly nervous and the fact she was a maiden lady, such examinations excite them excessively, and the fact she had the conditions as her sister described, I think that any other examination

except what I did, would have been detrimental instead of beneficial."

He admitted that if he had made an X-ray plate prior to the time the bone peg pierced the bladder that he could have ascertained its position and that he waited until April, 1934, before he called a urologist. He declared that he waited such a long period of time because he did not think it was necessary to call one sooner, and when Dr. Tydings informed him that the ordinary treatment for cystitis did not cure the patient's condition, that he had another urinalysis made when pus and blood were detected; then he decided that when she was able, he would see what was the cause of the trouble. He did not make the urinalysis himself, but Dr. Tydings did. He expressed the opinion that the bone peg, from the time it started until it got clear out of the hip bone as far as it had gone, was probably six weeks and that its presence after it left the hip bone produced a great amount of pain. He discovered about the first of January the peg was out of the hip bone; that usually if the peg moved at all, the displacement always worked outwards. "There is no case on record where any ever worked in," and he had no reason to justify moving the patient, jeopardizing the union that was taking place, or to take an X-ray picture for something that was never known to happen before. This testimony is substantiated by that of Dr. Grant when he declared: "There is no report in medical literature of such happening."

He further testified:

"Now, in an intracapsular fracture which she had, ninety persons out of a hundred are in pain because the head is absorbed under union. The idea of putting a peg through is not only to hold it in position, but the very fact that the head of this bone ties, and the nourishment comes from this side, the outside, and the cells are pulled along on this peg and form a new head out over this peg. That is the reason I said we did not want to remove it was that it might do lots of good, and in the end the result proved that my conclusions were correct. * * * In the treating of those cases we have to consider the body as a whole, not any one special organ, or part of the body."

Later, "she had some infection of her body which she was unable to throw off and I think this infection she had in this hip joint did not come from the operative field, but came through the blood stream and lodged in this area just the same as it lodged in the opposite hip." Speaking about "the peg slipping out, it is unfortunate this one slipped in. Had this bone slipped half way or had any connection in the head of this bone and still remained in the bladder, I never would have consented for it to be removed because if I had removed it at that time the urine would have come back through the back into the head of the bone and come down in this tissue and caused probable death. * * * And the mere presence of a foreign body in the bladder, while it is irritating, is not necessarily dangerous if removed in a reasonable length of time. * * * Each individual case is a case of its own. I cannot say, nor can any other doctor say just how he would have treated this case, without he was in attendance on the case at the time. * * * The general rule is to check the body of the patient as a whole and in selecting any method of treatment we select the least of two evils in any condition. The best thing in my judgment was not to do those things."

The foregoing is a summary of the salient points of the evidence supporting her cause of action. It is her contention that Dr. Arnold was grossly negligent and became legally responsible for her "excruciating suffering" by reason of his neglect to take any of the following steps, either of which would have disclosed the cause of her suffering:

"[a] Physical examination
"[b] Vaginal examination
"[c] Cystoscopic examination
"[d] X-ray examination."

On this premise she insists that Dr. Arnold admitted on the witness stand that he made no X-ray, digital, or vaginal examination; that he did not advise the family physician to keep samples of the bloody urine or of the pus that flowed from the bladder or make or cause to be made a cystoscopic examination. Quoting Dr. Holbrook's testimony, in her brief, she states:

"They have to be lifted up a bit to slip the plates [X-ray plates] under them; that is about all there is to it. So far as taking a picture in the home and so far as discomfort to the patient is concerned, they have to be moved, of course, to slip the plates [X-ray plates] under them."

She argues that (on the authority of Burk v. Foster, 114 Ky. 20, 69 S. W. 1096, 24 Ky. Law 791, 59 L. R. A. 277, 1 Ann. Cas. 304; Baute v. Haynes, 104 S. W. 272, 31 Ky. Law Rep. 876, 12 L. R. A. (N. S.) 752; Donoho v. Rawleigh, 230 Ky. 11, 18 S. W. (2d) 311, 69 A. L. R. 1135; Hoover v. McCormick, 197 Ky. 509, 247 S. W. 718; 21 R. C. L. 389, 406, and 407; Schweitzer's Trial Manual for Negligence Actions, p. 543; 48 C. J. 1151) such facts conjuncturally considered with the failure of Dr. Arnold sooner to discover, or cause to be discovered, the freakish migration of the bone peg, its lodgment in the bladder, thus permitting it to cause extreme, excruciating pain for such a long period of time, establish her cause of action with such certitude as entitled her to have the case submitted to the jury. The hypothesis on which she rests her right of recovery, entirely excludes the fact that she was afflicted with a broken hip. Her theory omits to observe that the superimposed duty of Dr. Arnold was to cure the broken hip, and to allow Dr. Tydings to continue his treatment of the abdominal and bladder trouble, unless and until its symptomatic condition imperatively demanded that the treatment of the hip condition be subordinated to that of the latter. It is easy to be seen that her right to recover and Dr. Arnold's liability to her cannot be determined solely on the premise that her sole ailment was abdominal and bladder trouble.

It is admitted in the petition that the fortuitous lodging of the bone peg in the bladder was without the semblance of fault on the part of Dr. Arnold. It is true its location in the tissue, before it entered the bladder, as well as after it completed its tour and lodged therein, could have been observed by an X-ray examination; but the fractured hip and its cure were of first importance.

Its treatment and cure and the intelligent treatment of the abdomen and bladder trouble at the same time were entirely compatible. And the medical testi-

mony establishes beyond doubt or debate that so long as
the paramountcy of the condition of the latter was not
obviously imperiling her health or life, it was Dr. Arn-
old's duty to allow Dr. Tydings' treatment thereof to
be continued until the fracture was in a fit condition for
her to undergo, without interrupting it, an X-ray ex-
amination and operation to relief her of the abdominal
and bladder ailment, though she suffered therefrom
during the period of delay.

It is in like manner established that so long as the
peg to any extent was in the hip bone, or passing into
the bladder, and was not entirely within it, an operation
to remove the peg was not only not advisable, but peril-
ous to her fractured hip as well as to her health and
life. Therefore, if Dr. Arnold, by an X-ray examina-
tion, or otherwise, had sooner located it, such would not
have authorized or justified its removal. And it should
be conceded no sort of an examination that could have
been made by any means or method whatsoever, would
have alleviated the pains in the abdomen and bladder
and only an operation would have done so.

The testimony establishes that the advisability of
making any sort of an examination of her abdomen and
bladder was to be governed by her entire condition, and
not merely that of the abdomen and bladder, having due
regard to her ultimate recovery from all of her ail-
ments.

The evidence abundantly establishes that at no
time did the condition of her abdomen and bladder au-
thorize or justify Dr. Arnold to explore either by any
method of examination, disregarding the condition of
her hip. It was not attempted to be shown by any evi-
dence that the pain and suffering caused by the condi-
tion of the abdomen and bladder, required at any time
the administration of a sedative. This fact is signifi-
cant, and strongly tends to establish the soundness of
Dr. Arnold's judgment not to sacrifice the treatment
and cure of the fractured hip, for the sake of sooner
discovering the source or cause of the pains in the ab-
domen and bladder, though excruciating.

"The presumption of negligence is never indulged
in from the mere evidence of mental pain and suffering
of the patient, or from failure to cure, or poor or bad

results, or because of the appearance of infection. The burden of proof is upon the patient to prove the negligence of the physician or surgeon, and that such negligence was the proximate cause of his injury and damages. Ault v. Hall, supra [119 Ohio St. 422, 164 N. E. 518, 60 A. L. R. 128]; Rawleigh v. Donoho, 238 Ky. 480, 38 S. W. [2d] 227. The doctrine of res ipsa loquitur has no application in such cases. Miller v. Blackburn, 170 Ky. 263, 185 S. W. 864; Donoho v. Rawleigh, 230 Ky. 11, 18 S. W. [2d] 311, 69 A. L. R. 1135; Prewitt v. Higgins, 231 Ky. 678, 22 S. W. [2d] 115; Loudon v. Scott, 58 Mont. 645, 194 P. 488, 12 A. L. R. 1487. Therefore, the failure to effect a cure or to obtain the result expected by the patient does not raise the presumption of a want of proper care or a lack of skill and diligence [Miller v. Blackburn, supra], nor create an inference of incompetency or negligence. Western Union Tel. Co. v. Mason, 232 Ky. 237, 22 S. W. [2d] 602. He is not responsible for the erroneous exercise of judgment, provided he informs himself of the facts by proper investigation. Casenburg v. Lewis, 163 Tenn. 163, 40 S. W. [2d] 1038. The presence of infection following an operation is neither prima facie evidence of, nor per se, negligence. Rawleigh v. Donoho, supra; Loudon et al. v. Scott, 58 Mont. 645, 194 P. 488, 12 A. L. R. 1487.

''The facts necessary to establish a cause of action against a physician or surgeon for malpractice can only be proven by experts, skilled in medicine or surgery, qualified to testify where the matter in issue is exclusively within the knowledge of experts. The right of recovery cannot be established by the testimony of laymen unless the subject-matter involved is common knowledge or ascertainable by nonexpert's senses. Donoho v. Rawleigh, supra; Rawleigh v. Donoho, supra; Rising v. Veatch, 117 Cal. App. 404, 3 P. [2d] 1023. And where the proof of facts which show or tend to show negligence on the part of the physician or surgeon depends upon expert opinion, if it shows nothing more than error of judgment, there is in law no proven facts upon which the inference of negligence may be founded. Nicholas v. Jacobson, 113 Cal. App. 382, 298 P. 505. For like reasons where expert evidence fails to show negligence of the physician or surgeon, and there is no evidence to indicate an act or omission on his part within the common knowledge of a layman, the jury

cannot infer negligence and a peremptory is proper. Nicholas v. Jacobson, supra; Farrell v. Haze, 157 Mich. 374, 122 N. W. 197; Miller v. Toles, 183 Mich. 252, 150 N. W. 118, L. R. A. 1915C, 595. The appearance of an injured person after the treatment of a physician or surgeon has commenced, and the patient's declaration respecting existing pain, or its severity, may be proven by the testimony of laymen; but whether the negligence of the attending physician or surgeon was the primary cause thereof must be established by expert testimony. Donoho v. Rawleigh, 230 Ky. 11, 18 S. W. [2d] 311, 69 A. L. R. 1135; Rawleigh v. Donoho, 238 Ky. 480, 38 S. W. [2d] 227; Barrett's Adm'r v. Brand, 179 Ky. 740, 201 S. W. 331; Kuehnemann v. Boyd, 193 Wis. 588, 214 N. W. 326, 215 N. W. 455; Gallagher v. Kermott, 56 N. D. 176, 216 N. W. 569; Halverson v. Zimmerman, supra [60 N. D. 113, 232 N. W. 754]; Bennett v. Northern Pac. R. Co., 2 N. D. 112, 49 N. W. 408, 13 L. R. A.. 465; 3 Jones Commentaries on Evidence [2d Ed.] p. 226, sec. 1213.'' Stacy et al. v. Williams, 253 Ky. 353, 69 S. W. (2d) 697, 704; Quickstad v. Tevenner (Minn.) 264 N. W. 436.

Analyzing and testing the medical testimony in her behalf with these principles in mind, it is perfectly plain that it utterly fails to establish that Dr. Arnold failed to do something that he should have done, or did something that he should have left undone. This testimony exonerates him fully of every semblance of negligence in his treatment of the patient. The court properly directed a verdict in his favor.

Wherefore, the judgment is affirmed.

The whole court sitting.