On the afternoon of February 19th, 1941, Helen Elsie Wells, 7 years of age and the daughter of the plaintiff, Mrs. Nell O. Wells, was playing on the school grounds of the Franklinton Grammar School and fell and sustained a Colle's fracture of the right fore arm. She was taken to the office of the defendant, Dr. W. R. McGehee, where she was administered an anesthetic, viz.: Chloroform, and died within a few minutes. Plaintiff therefore filed this suit in which she charges that Dr. McGehee was guilty of malpractice in that he administered the anesthetic without having made any preliminary examination of the heart and lungs of this child, and also in a grossly careless, unskillful and indifferent manner, in a quantity which caused the death of the child, and that he made no effort to revive the child, and, lastly, that plaintiff was at her home and that had she been summoned she would not have consented to the administering of the chloroform without consulting another physician. Plaintiff therefore prays for judgment against the defendant for the loss of affection and companionship of her child and mental anguish and suffering caused by the death of the child, in the sum of $10,000.00; for loss of earnings she might have expected from this child, $2000.00; and for the loss of insurance in the amount of $500.00, in that she had a policy of insurance on the life of this minor child in the sum of $500.00 with a clause providing for double indemnity in the event of accidental death, and that she was without funds to bury the child until she had collected this life insurance and the defendant absented himself and refused, neglected and failed to furnish plaintiff with a death certificate until such time that the plaintiff had to accept a settlement with the insurance company in the sum of $500.00, and therefore plaintiff prays for judgment for total damages in the full sum of $12,500.00 against the defendant.
The defendant filed a general denial and set up that the anesthetic was administered in accordance with his instructions and under his direct supervision. *Page 198 
The judge, in a well written opinion, rendered judgment in favor of the defendant, dismissing plaintiff's suit at plaintiff's costs. From this judgment plaintiff obtained a devolutive appeal to this Court. The defendant through his counsel has filed a motion to dismiss the appeal of the plaintiff for the reason that the devolutive appeal herein was by petition, and appellant failed to file the bond as fixed by the order prior to the service thereof, or within ten days after the date of the order.
The record shows that the plaintiff secured an order for a devolutive appeal on October 6, 1948, returnable to the Court of Appeal for the First Circuit on the second Monday of November, being November 8, 1948, upon furnishing bond in the sum of $50.00, and also an order that a copy of the petition and order and citation of appeal be served upon Dr. W. R. McGehee, defendant, according to law. Service was made upon the defendant on the 7th day of October, 1948 by A. O. Passman, Deputy Sheriff. The bond was filed on October 25, 1948 and motion to dismiss the appeal was filed in this Court on January 19, 1949.
Counsel for defendant rely upon the case of Campbell v. F. Hollier Sons, La. App., 4 So.2d 101. In this case, no appeal bond was ever filed and the Court held that there was no appeal and on its own motion dismissed appellants suspensive appeal for this reason. There is no doubt that the case relied upon by defendant is correct. The service of the petition and order of appeal was made prior to the filing of the bond, but when the bond was timely filed and the appeal perfected in this Court, the defendant's motion to dismiss should have been filed within three days after the filing of the transcript in this court and therefore came too late. Esparros v. Vicknair, 191 La. 193,184 So. 745; Power v. Christina, 7 La. App. 651; Powell Motor Co. v. A. Christina Bros., 8 La. App. 174; Dart's Stats. § 1413, Act No. 45 of 1870, Ex. Sess., § 11.
Conceding for the mere sake of argument that the motion to dismiss the appeal was timely filed, we are of the opinion that there is no merit to the motion. It is a fact that the citation of appeal was issued by the clerk before the filing of the bond, however, the appeal bond was timely filed. It is the duty of the Clerk of Court to issue the citation in order that the order of appeal may be served on the appellee. The appellant has nothing to do about it. The appellant's duty is solely to furnish the bond as called for in the order during the delay required by law. The appellant in this case has fulfilled all of her duties. The district clerk of court was a little too overzealous in the performance of his duties. This cannot be charged to appellant.
However, regardless of whether this motion to dismiss was timely filed, we still think that it should be denied as the bond was timely filed and appears in the record, which has the effect of curing the prematurity of the service of citation of appeal. See Mossler Acceptance Co. v. Moliere, La. App., 181 So. 228.
The facts in this case show that plaintiff's daughter, Helen Elsie Wells, was playing with some other children during the afternoon recess of the Franklinton School and, as a result of being pushed by one of the children, she fell and broke her right arm in the vicinity of the wrist. Mr. Hugh E. Foil, who was the principal of the elementary school, testified that soon after this accident happened he made an attempt to locate the mother, plaintiff herein, by call- the canning plant or Dr. T. C. W. Magee, and, being unable to do so, he then phoned to Dr. McGehee, defendant herein, and asked him if he would take the child and the Doctor told him to bring her to his office. Mr. Foil testified that he felt in this case that the child needed medical attention at once and, after attempting to locate the mother and failing, he thought it best to get the child to a doctor as soon as possible. Although this witness testified that the plaintiff worked out and although she lived only a mile from the school, he made no attempt to locate plaintiff in her home as he did not know whether he would find her there and he "was most interested in getting the little girl to a physician as quickly as possible in order that her wrist might be set." He was accompanied to the doctor's office by Miss *Page 199 
Thelma Wood, another teacher in the school and whom he left with the little girl in the doctor's office. Miss Wood remained with the child during the entire operation and until after she died.
The law seems to be well-settled:
"That where the physician or surgeon uses all the customary precautions practiced by the profession in the particular locality, no liability is incurred. Thus, the highest degree of skill and knowledge is not required in every case, but only such skill and knowledge and practices as are common with the profession in the locality where the physician or surgeon happens to practice."
In the case of Mournet v. Sumner, 19 La. App. 346, 139 So. 728, at page 730, the Court, in the body of the opinion, held as follows:
"The general rule with reference to the responsibility of a doctor for malpractice is stated in 30 Cyc. p. 1507 as follows: 'A physician or surgeon undertaking the treatment of a patient is not required to exercise the highest degree of skill possible. He is only required to possess and exercise that degree of skill and learning ordinarily possessed and exercised by the members of his profession in good standing practicing in similar localities and it is his duty to use reasonable care and diligence in the exercise of his skill and the application of his learning and to act according to his best judgment.'
"This principle of law was approved by our courts in the following cases: Roark et al. v. Peters et al., 2 La. App. 448; Id., 162 La. 111, 110 So. 106; Gouner v. Brosnan et al.,155 La. 1, 98 So. 681; Stern v. Lanng, 106 La. 738, 31 So. 303; Lett v. Smith, 6 La. App. 248; Comeaux v. Miles, 9 La. App. 66, 118 So. 786.
"The duty and liability of a dentist to his patient corresponds with that of physicians and surgeons generally. Lett v. Smith, supra; Ruling Case Law, vol. 21, p. 386, verbo 'Physicians and Surgeons.'
"In the case of Gouner v. Brosnan, supra, in determining who bore the burden of proof in this class of cases, our Supreme Court said: 'The burden is upon the plaintiff to establish by a fair preponderance of the evidence the allegations of his petition charging Dr. Brosman with "negligence, carelessness, want of skill and malpractice" in the methods he employed and in the manner he treated plaintiff's wound.' See, also, Roark v. Peters, supra."
"Justice William Howard Taft, as the organ of the United States Circuit Court of Appeals, in the case of Ewing v. Goode, C.C., 78 F. 442, 443, used the following language: 'A physician is not a warrantor of cures. If the maxim, "res ipsa loquitur," were applicable to a case like this, and a failure to cure were held to be evidence, however slight, of negligence on the part of the physician or surgeon causing the bad result few would be courageous enough to practice the healing art, for they would have to assume financial liability for nearly all the "ills that flesh is heir to." ' See, also, Cassingham v. Berry,67 Okla. 134, 150 P. 139, 168 P. 1020; Ayala v. King-Ryder Lumber Co., 146 La. 536, 83 So. 799; Stern v. Lanng, supra; Lett v. Smith, supra; Nixon v. Pfahler, 279 Pa. 377, 124 A. 130.
"The rule is well established that a physician or dentist cannot be held liable for the death of a patient under his treatment, where there is no evidence to show negligence or lack of skill on his part, sufficient to overcome the prima facie case in his favor made by the evidence that the treatment adopted by him was the usual and customary one. The fact that a patient died under such circumstances does not raise any presumption of negligence or lack of skill on his part. Hoover v. Buckman, 194 Ill. App. 308; Edwards v. Uland, 193 Ind. 376, 140 N.E. 546; Moore v. Smith, 215 Ala. 592, 111 So. 918; McGraw v. Kerr, 23 Colo. App. 163, 128 P. 870; King v. Belmore,248 Mass. 108, 142 N.E. 911; Loudon v. Scott, 58 Mont. 645, 194 P. 488, 12 A.L.R. 1487; Hoffman v. Watkins, 78 Wn. 118, 138 P. 664; Miller v. Toles, 183 Mich. 252, 150 N.W. 118, L.R.A. 1915C, 595; Woodlawn Infirmary v. Byers, 216 Ala. 210,112 So. 831; Beckwith v. Boynton, 235 Ill. App. 469; Wilt v. McCallum, 214 Mo. App. 321, 253 S.W. 156; Niebel v. Winslow, 88 N.J.L. 191, 95 A. 995; Kuehnemann *Page 200 
v. Boyd, 193 Wis. 588, 214 N.W. 326, 215 N.W. 455; McCoy v. Buck, 87 Ind. App. 433, 157 N.E. 456, 160 N.E. 46; Nixon v. Pfabler, supra; Blodgett v. Nevius, 189 Ill. App. 544; Wilkins v. Ferrell, 10 Tex. Civ. App. 231, 30 S.W. 450."
The opinion in the case of Mournet v. Sumner, above referred to, was approved in the year 1944, in suit of Freche v. Mary, La. App., 16 So.2d 213. See Also 41 American Jurisprudence, Section 89, page 205.
From this statement of the law it is therefore necessary that we examine the record in this case to ascertain whether Dr. McGehee, the defendant herein, was guilty of malpractice in failing to make a proper examination of Helen Elsie Wells before placing her under the anesthetic or in giving or causing to be given an overdose of chloroform, and in failing to obtain the consent of the mother, plaintiff herein, before undertaking the treatment of the child.
Dr. McGehee testified that after determining the kind and nature of the fracture, he decided that he would use Chloroform in setting the arm. Before giving the chloroform, he always examined the heart of the patient, and in this instance, he examined this child's heart by determining the size as near as possible, the rate of pulse, the character of the pulse and listening to, termed "Auscultation", of the heart with a stethoscope. He also listened to the lungs for any pathosis that might be present.
Without going into detail, Dr. W. S. Harrell, the physician and surgeon at the Elizabeth Sullivan Memorial Hospital in the City of Bogalusa for fourteen years, testified that prior to giving an anesthesia to anyone he would ascertain how the heart was functioning, that is, he would listen to see if the heart was functioning normally, to determine whether there was any tuberculosis or cold that might be aggravated by an inhalation type anesthesia, and that he would make this examination with a stethoscope. This is exactly the same examination made by the defendant, Dr. McGehee, before administering the anesthetic to the Wells child. There is no testimony in the record that any different examination was ever made by any other physician in that parish or neighborhood other than as testified to by Dr. McGehee and Dr. Harrell, and therefore, under the law, Dr. McGehee was not guilty of malpractice on this count.
As to the second charge that the chloroform was administered by an incompetent assistant and the child was given an overdose, the record reveals that under the facts and circumstances in this case that chloroform was the recognized anesthesia to be given by the doctors in the surrounding countryside. Dr. McGehee's office was heated by an open-face gas heater, and it was agreed by all medical witnesses that ether could not be used around an open flame as it is very highly inflammable and, under such circumstances, might cause an explosion of the patient's lungs due to gas-ether. The record shows that a patient who has been given ether is very susceptible to pneumonia and, in the present case, had ether been administered, the child would have had to remain in the office overnight and there were no beds there. Dr. Stafford and Dr. Harrell both testified that chloroform was the proper anesthesia to use under the facts in this case and that, under the same circumstances, they would have used it also. The testimony therefore sustains Dr. McGehee in his choice of the use of chloroform.
Mrs. Bessie Sweeney was employed by Dr. McGehee as a nurse in his office and, on the date of the trial which was April 7, 1947, had been so employed by Dr. McGehee since 1933. She testified that she administered the anesthesia in his practice and did so in the present case. The testimony shows that the chloroform was given by the drip method. A regular mask with gauze on it is placed over the patient's face and the chloroform is dropped on this gauze. She administered the chloroform under the direction of Dr. McGehee. Mrs. Sweeney had trained in the hospital at Tylertown, Mississippi, for 26 months in general nursing and only lacked 10 months of finishing, which would have entitled her to a certificate as a registered nurse. She studied the administration of anesthesia while at the hospital but had *Page 201 
no practical experience there, however, she had been giving the anesthesia for Dr. McGehee in his practice since she had been employed by him. In our opinion, the testimony shows that she was well versed in the administration of anesthesia and the effect of same and the different stages involved in general anesthesia. The testimony convinces us that she was competent to give the chloroform in the present case and, furthermore, she administered it under the direction of Dr. McGehee who was present at the time she gave the anesthesia, although busy part of the time in setting the little girl's arm.
As to the amount of chloroform given, while it is true that the plaintiff, Mrs. Wells, testified that the child's nose, face and mouth were burned and that the chloroform was given direct from the bottle and that there was no mask used, her testimony is entirely refuted on this point by Dr. McGehee, Mrs. Sweeney, Miss Thelma Wood, the teacher who remained with the child until after her death, and by Dr. Ward, Coroner of the Parish, who saw no burns; by Mr. C. C. Simmons, the undertaker, and his assistant, Mrs. Elizabeth Brumfield, who helped embalm the child; by Miss Carmen Stringfield, who was also a teacher in the grade school at Franklinton and who saw the child after she died.
Within three minutes after the beginning of the administration of the chloroform, the child had stopped breathing, and Dr. McGehee then immediately took means to resuscitate the child. Miss Wood testified that from the time the child was taken into the operating room until she died was not more than five minutes. Dr. McGehee and Mrs. Sweeney both testified that this child went from the first stage of anesthesia which is shown to be "before you induce sleep", directly to the last stage which is death. Dr. Harrell testified that some patients are hypersensitive to certain kinds of anesthesia and that there is no way of determining this prior to its application. There is no doubt from the testimony in this case, that plaintiff's little daughter was hypersensitive to chloroform, which produced an immediate toxic condition resulting in her death, and which was diagnosed by Dr. Ward, the Coroner of Washington Parish, as chloroform poisoning.
It is also shown by the testimony of Dr. McGehee, and there is nothing in the record to the contrary, that when chloroform is well diluted with air and the patient dies, it is with respiratory failure first and cardiac failure later or within several minutes, due to the lack of oxygen, and that when chloroform is administered too quickly and in too large amounts so that it is not well diluted with air, the heart stops beating first, due to failure of the heart, and in the instant case, there was respiratory failure first and the heart was beating for several minutes afterwards. It is apparent, therefore, that this child did not die from an overdose of chloroform but as a result of a toxic condition produced by the chloroform and explained by Dr. W. S. Harrell in his testimony.
The plaintiff has also charged that Dr. McGehee did not endeavor to resuscitate the child, and although she was not present until after the child had died, she testified to this effect. The testimony of Miss Thelma Wood, Mrs. Sweeney and of the defendant, Dr. McGehee, refutes this charge. Miss Wood and Mrs. Sweeney testified that artificial respiration was used as well as hypodermics, and Dr. McGehee testified that he "immediately began trying to revive the child by means of injections of adrenalin into the vein and giving artificial respiration because the heart was still beating, but the child was not breathing. This did not work so I gave a hypodermic of 1/130 grain of atrophine of sulphate. Then I continued to give artificial respiration in the usual manner. I think by three different manners; lying prone with rhythmic pressure and releasing lower ribs posterior and working the arms back and forth to and from the body; putting the child over my shoulder and taking her back; these methods failed and I then gave the child an injection of coramine; still no breathing, the child's heart was getting weaker. I injected 1/2 of 1 c.c., I am not positive about the 1/2, it could have been one, into the heart muscles." *Page 202 
There is no doubt from the testimony but that everything was done to revive the child.
There only remains to be decided the question as to whether the defendant is liable herein by reason of the fact that he failed to obtain the consent of the mother, who was a widow, before undertaking the treatment as given by him to this child.
On this question the facts are simple. The consent of the mother could not be obtained. However, the record shows that Mr. Foil, the principal of the grammar school, called the canning plant where he understood the mother was working or Dr. T. C. W. Magee's office, in an effort to locate her before calling Dr. McGehee. He was unsuccessful.
"The general rule that a surgeon operates at his peril without first obtaining the consent of his patient or someone legally authorized to consent for him is qualified in its application by most courts in cases of emergency or unanticipated conditions where some immediate action is found necessary for the preservation of the life or health of the patient, and it is impracticable to first obtain consent to the operation or treatment which the surgeon deems to be immediately necessary. * * * It has been said, too, that the rules of professional conduct of trained and expert surgeons must be fixed to reasonably fit complex modern conditions, and that such a surgeon, confronted by an emergency, must be permitted, after a fair and careful examination of the patient, to exercise his best professional judgment as to the necessity for immediate operation or treatment without waiting for the consent ordinarily required. In such a case, where the emergency endangers the life or health of the patient, it is the surgeon's duty to do that which the case demands within the usual and customary practice among physicians and surgeons in the same or similar localities, without the consent of the patient or his parents." See 41 American Jurisprudence 222, par. 110.
Under the facts in this case, we are of the opinion that an emergency existed and that under such emergency, Dr. McGehee was fully justified to proceed in the manner in which he did without the express consent of the child's mother, as Dr. McGehee followed the usual and customary practice among physicians and surgeons in the same locality.
For the above reasons, the judgment of the District Court will be affirmed.