RENDERED:  OCTOBER 20, 2023; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-0669-MR

COLIN MULHALL, AS EXECUTRIX
OF THE ESTATE OF CAROL
MULHALL                                                                    APPELLANT


                        APPEAL FROM JEFFERSON CIRCUIT COURT
v.                      HONORABLE AUDRA J. ECKERLE, JUDGE
                              ACTION NO. 16-CI-005102


SUNRISE SENIOR LIVING
MANAGEMENT, INC.; AND
SUNRISE SENIOR LIVING
SERVICES, INC.                                                             APPELLEES


OPINION
AFFIRMING

** ** ** ** **

BEFORE:  THOMPSON, CHIEF JUDGE; EASTON AND KAREM, JUDGES.

EASTON, JUDGE:  The Appellant, Colin Mulhall ("Colin"), as Executrix of the

Estate of Carol Mulhall, appeals from the Jefferson Circuit Court's Order granting

Summary Judgment to the Appellee, Sunrise Senior Living Management, Inc.

("Sunrise"). The circuit court held that Colin did not have qualified expert testimony to establish the relevant standard of care, breach of duty, or causation of injury leading to the damages claimed; therefore, Sunrise was entitled to summary judgment as a matter of law. Having reviewed the record and the applicable law, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

Carol Mulhall ("Carol") was Colin's mother. Carol was diagnosed with vascular dementia in 2012. Soon after, Carol executed a Durable Power of Attorney and a Healthcare Power of Attorney, designating Colin as her Health Care Surrogate. In 2015, Carol began showing increasing symptoms of her vascular dementia, including anxiety, agitation, and short-term memory loss. Carol became a resident of Sunrise on December 18, 2015.

Sunrise is a Personal Care Home ("PCH"). A PCH is a statutory creation in Kentucky, governed by KRS[1] 216.597. It is like an Assisted Living Community but has fewer licensing requirements. A PCH "means an establishment located in a permanent building that does not comply with the physical plant requirements of KRS 194A.703,[2] has resident beds, and provides: 1) Supervision of residents; (2) Basic health and health-related services; (3)

---

[1] Kentucky Revised Statutes.

[2] Statute governing Assisted Living Communities.

Personal care services; (4) Residential care services; and (5) Social and recreational activities." KRS 216.597(1)(b). Sunrise had a dedicated memory care unit, which was where Carol resided.

Colin and her brother, Sean Mulhall ("Sean"), testified in their depositions that Sunrise's Director, Brandie Windsor ("Windsor"), advised the family not to visit for the first few weeks to allow Carol to adjust. Both testified this was surprising advice to them, as they typically visited Carol almost every day. Colin further testified that they did initially stay away from Sunrise but that she called daily asking for updates on Carol.

Colin learned Carol was exhibiting aggressive behavior, increasing agitation, and was refusing to take her medication. Windsor also informed Colin that Carol had a "boyfriend," a fellow resident in Sunrise's memory care unit. Colin testified Windsor told her that Carol and this male resident sat together and held hands. Colin further stated Windsor informed her it was more of a "love triangle," as this male resident also appeared to have a relationship with another female resident. Colin testified this information concerned her, so she decided to visit Carol at Sunrise soon after.

Colin stated when she visited Sunrise, she found Carol in this male resident's room, with the door closed. She further testified that Carol told her that

this resident slept in her bed at night. Colin stated this troubled her greatly, so she spoke with Windsor about it.

Colin believed her mother did not have the capacity to consensually engage in this type of relationship. She addressed her concerns with Windsor, who agreed that Carol probably did not have the cognitive ability to make this decision, but there was "nothing she could do about it." Windsor testified in her deposition that the relationship did not concern her, as the interactions between Carol and this male resident appeared to be consensual.

Further progress notes indicate that Carol became more aggressive and agitated. She pushed another resident, slammed doors, and hit other residents and a nurse. Colin was also informed that Carol had been refusing medication. For example, as of approximately January 21, 2016, Carol had missed eight out of her last twenty doses of Xanax because she refused to take them.

Sean testified that he spoke with an employee at Sunrise, who informed him Carol and another female resident had several altercations. He was told the other resident was the woman who was also in a relationship with the male resident Carol was spending time with. This employee told Sean that any time this male resident would pay attention to anyone other than Carol, Carol would get jealous. Carol and the other female resident had been in several physical and verbal altercations regarding the male resident.

-4-

On January 26, 2016, Colin was advised by Windsor that Carol required in-patient psychiatric hospitalization. Windsor and Colin arranged for Carol to be taken to The Brook.[3] Prior to leaving Sunrise to transport Carol to The Brook, Colin witnessed the male resident kiss Carol. She also testified that this male resident was wearing Carol's pants.

Carol spent approximately three weeks at The Brook. There was no evidence offered of any interpersonal relationship for Carol at that facility. Yet during Carol's stay there, she became increasingly agitated and aggressive, leading her to be given Ativan. Colin testified the Ativan sedated Carol to the point of her being unresponsive. Colin further testified that Carol declined significantly while at The Brook. She became incontinent and began to need assistance with activities of daily living which she was previously able to do independently. Carol did not return to Sunrise after her discharge from The Brook. She lived with Colin for a while, had another psychiatric hospitalization, and then eventually was placed in a skilled nursing facility in Indiana.

Colin filed a Complaint against Sunrise in the Jefferson Circuit Court on October 13, 2016, alleging negligence, medical negligence, corporate

---

[3] A psychiatric hospital located in Louisville.

negligence, violations of Kentucky's Long Term Care Residents' Rights statute,[4] and separate causes of actions against Windsor as administrator.

On March 30, 2020, Carol passed away. Colin filed a motion to revive the action and substitute the estate as the plaintiff, which the circuit court granted. The circuit court additionally granted Sunrise's motion to enforce a jury trial waiver that Colin signed as part of Carol's admission paperwork. In October 2021, the circuit court granted partial summary judgment to Sunrise, dismissing Colin's claims based on negligence per se under all federal statutes and under KRS 216B.072. This order also dismissed all claims against Windsor as the administrator. The circuit court allowed the negligence claims based on KRS 216.515 and KRS 209.005 *et seq.* to proceed.

When setting the trial date for this case, the circuit court established deadlines for the disclosure of experts. In compliance with this directive, Colin disclosed two expert witnesses: Byron Arbeit, a former nursing home administrator and long-term care industry expert and Dr. Thomas Sullivan, a neuropsychologist. Sunrise disclosed as their experts Dr. G. Paul Eleazer and RN[5] Janine Lehman. Because of the deadline applied, the circuit court was authorized to evaluate summary judgment based on the expert opinions timely disclosed. *See*

---

[4] KRS 216.515.

[5] Registered Nurse.

*Blankenship v. Collier*, 302 S.W.3d 665, 675 (Ky. 2010). The deposition testimony of the experts is summarized below.

Byron Arbeit ("Arbeit") testified it was a violation of the standard of care for Sunrise to allow Carol to be involved in an intimate relationship with another resident without the consent and permission of Carol's healthcare representative. He stated Carol did not have the capacity to consent to such a relationship. Arbeit testified Sunrise failed to provide adequate supervision and monitoring of the residents.

Arbeit further testified it was a breach of care for Windsor to fail to inform Colin of Carol's increasing agitation and aggression, and that she should have asked for assistance from the family. He claimed Sunrise failed to properly document Carol's changes in condition and failed to advise her family. Arbeit stated Sunrise failed to follow physician orders regarding Carol's medication, specifically, her Xanax prescription. He testified their failure to provide Carol with her anti-anxiety medication as prescribed constituted physical and mental abuse. He further testified he believed there was a strong possibility of drug diversion, as there was inconsistency in the medication records.

Dr. Sullivan is a neuropsychologist. He testified he regularly treats patients with vascular dementia. He testified because Carol and the male resident were cognitively impaired, Sunrise had a duty to intervene. He stated it was "poor

judgment" for the facility to allow the relationship because of the strong emotions it raised for Carol. He stated Carol's quick deterioration during her short residency at Sunrise was not typical for her medical condition. Dr. Sullivan also opined that Sunrise's advice to Carol's family to not visit was a cause of her decline and likely exacerbated her emotional and behavioral problems. He testified Carol should have been given Xanax twice daily to ease her transition, and that the failure to administer the Xanax led to her increased anxiety and agitation. Dr. Sullivan also stated it was "unusual" that Carol required an in-patient hospitalization in a psychiatric facility.

Dr. G. Paul Eleazer testified for Sunrise. He opined that Sunrise met the applicable standard of care and that no act or omission by the staff caused Carol any injury within a reasonable degree of medical probability. He further testified there was no evidence of any abuse. Regarding Carol's relationship with the male resident, he stated there was really no way to stop the relationship from occurring, short of recommending that one of them leave the facility. He also testified that any attempt to intervene in the relationship would "likely have made things worse."[6]

Janine Lehman was Sunrise's second expert to testify. Ms. Lehman is a registered nurse who is a nursing standard of care expert. She testified Sunrise

_____

[6] Dr. Paul Eleazer Deposition, January 5, 2022.

-8-

met the applicable standard of nursing care in its care and treatment of Carol. She also testified she saw no evidence of abuse. Further testimony will be discussed below.

On December 22, 2021, Sunrise again filed a Motion for Summary Judgment on Colin's remaining claims, on the basis that Colin could not present any genuine issue of material fact, as she provided no expert testimony that could show breach of a duty of care or causation of any injury to Carol. The circuit court heard oral arguments on April 25, 2022. It entered a written order on May 12, 2022, granting summary judgment to Sunrise. The circuit court found neither of Colin's expert witnesses qualified to testify about the applicable standard of care or medical causation.

## STANDARD OF REVIEW

"The standard of review of a trial court's granting of summary judgment is whether the trial court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law. Summary judgment is proper when it appears that it would be impossible for the adverse party to produce evidence at trial warranting a judgment in its favor." *Andrew v. Begley*, 203 S.W.3d 165, 169 (Ky. App. 2006) (internal quotation marks and citations omitted). "Because summary judgment involves only legal questions and the existence of any disputed material issues of fact, an

appellate court need not defer to the trial court's decision and will review the issue *de novo.*" *Jenkins v. Best*, 250 S.W.3d 680, 688 (Ky. App. 2007).

"In reviewing the exclusion of expert witness testimony, this Court applies an abuse of discretion standard." *Jackson v. Ghayoumi*, 419 S.W.3d 40, 43 (Ky. App. 2012). "The trial court has discretion to control the presentation of evidence. In the absence of any abuse, the reviewing court will not reverse the decision of the trial judge." *Pendleton v. Commonwealth*, 685 S.W.2d 549, 554 (Ky. 1985). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair or unsupported by sound legal principles." *Woodard v. Commonwealth*, 147 S.W.3d 63, 67 (Ky. 2004).

## ANALYSIS

The allegations against Sunrise that survived the circuit court's granting of partial summary judgment in October 2021 are 1) Sunrise breached the standard of care by failing to obtain Colin's consent for Carol to be in an intimate relationship with another resident, which caused her emotional distress; 2) lack of supervision (specifically regarding the relationship between Carol and another resident); 3) lack of adequate intervention and care planning; 4) failure to follow physician orders regarding medication and possible drug diversion; and 5) other violations of the Kentucky Residents' Rights Act.

Colin argues that as Carol's healthcare representative, Sunrise should have sought Colin's consent to allow Carol to engage in an intimate relationship with another resident. Colin claims Carol did not have the cognitive capacity to consent to this relationship, and it caused Carol emotional distress. Colin asserts this was a direct cause of Carol's agitation and aggression, which led to her being hospitalized at The Brook.

Colin additionally alleges Sunrise failed to follow Carol's doctor's orders regarding Carol's prescription of Xanax. Colin claims that allowing Carol to refuse multiple doses of Xanax caused her increased anxiety and mental decline. Finally, Colin alleges Sunrise violated the Kentucky Residents Rights' Act by failing to keep Carol's family informed of her condition. Colin argues the family would have been able to assist with Carol's care and prevent the eventual hospitalization.

Ultimately, the surviving allegations are claims of negligence and negligence per se pursuant to KRS 209.005 *et seq.* and KRS 216.515. For a "cause of action based on negligence, a plaintiff must establish a duty on the defendant, a breach of the duty, **and** a causal connection between the breach of the duty and an injury suffered by the plaintiff." *Lewis v. B & R Corporation*, 56 S.W.3d 432, 436-37 (Ky. App. 2001) (emphasis added). In a standard medical negligence case, a plaintiff must prove the applicable medical standard of care, a breach of that care,

and an injury resulting from that breach of care. *Blankenship*, *supra*, at 675. To survive summary judgment, a plaintiff must present a genuine issue of material fact for every element. *See Begley*, *supra*, at 169.

"Under Kentucky law, a plaintiff alleging medical malpractice is generally required to put forth expert testimony to show that the defendant medical provider failed to conform to the standard of care." *Blankenship*, *supra*, at 670.

KRE[7] 702 is the rule that applies to expert testimony. It states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if:

> (1) The testimony is based upon sufficient facts or data;
>
> (2) The testimony is the product of reliable principles and methods; and
>
> (3) The witness has applied the principles and methods reliably to the facts of the case.

Pursuant to *Stringer v. Commonwealth*:

Expert opinion evidence is admissible so long as (1) the witness is qualified to render an opinion on the subject matter, (2) the subject matter satisfies the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), (3) the subject matter satisfies the test of relevancy set forth in

---

[7] Kentucky Rules of Evidence.

> KRE 401, subject to the balancing of probativeness against prejudice required by KRE 403, and (4) the opinion will assist the trier of fact per KRE 702.

956 S.W.2d 883, 891 (Ky. 1997).

A trial court must make several findings before a party is allowed to introduce expert testimony. It must first determine that an expert witness is qualified to testify about a particular issue. In this case, the issue was not whether Colin's experts could meet the *Daubert* criteria as to the area about which they offered to testify. Rather, the question was whether their respective areas of expertise could provide the required evidence for the negligence claims asserted in this case in which damages were sought for medical or psychiatric treatment. The circuit court in this instance found Colin's experts were unqualified to testify regarding the medical standards of care in a PCH and causation of Carol's claimed injury and damages.

Colin's first expert witness was Arbeit. Colin claimed Arbeit could testify as to the standards of care in a PCH. Colin asserted Arbeit was an expert in long-term care facilities, including PCHs such as Sunrise. The circuit court disagreed and ruled that because Arbeit could not testify as to any nursing or other medical standards of care, he is unqualified. Colin asserts the negligence in this action is not due to medical negligence, but administrative negligence on the part of Sunrise.

-13-

Arbeit was previously an administrator of several long-term care homes in the 1980s and 1990s. His most recent year as a director of a nursing home was in Indiana in 1997. He has never worked as an administrator in Kentucky. Arbeit testified that a PCH is a creation of statute in Kentucky, and it is not covered by Medicare or Medicaid regulations. They are not covered by any federal statute or regulation.

Arbeit has never worked in any capacity in a PCH. He has no medical training as a physician or as a nurse. He specifically states in his deposition, "I would not be providing any medical opinion whatsoever."[8] He further stated, "I'm going to give no opinions about any physician in this case. Any opinion that may deal with a nurse would be – I don't give any opinions that would be strictly within the nursing province of care. I will be giving opinions that can involve nursing dealing with the administration of personal care homes because those nurses are employed by the administrator. . . ."[9]

The circuit court believed Arbeit was criticizing Sunrise for issues in the realm of nursing standards, not simply administration issues. Arbeit has been determined by other courts as not qualified to give opinions relating to medical

---

[8] Deposition of Byron Arbeit, December 3, 2021.

[9] *Id.*

negligence.[10]  Ultimately, our analysis need not turn on Arbeit's testimony regarding an administrative standard of care.  We need not delve into the difficult question of whether and when a PCH should intervene in the personal relationships of those with dementia.  Regardless of any violation of administrative duties that may have occurred here, Colin still must show that any breach of a standard of care (administrative or otherwise) caused Carol's claimed injury to survive summary judgment.

The circuit court determined Dr. Sullivan was not qualified to testify regarding medical causation.  Dr. Sullivan is a neuropsychologist.  He is not a physician or a nurse, and he cannot prescribe medication.  He specifically answered in his deposition that he would not be able to offer any opinions on the standard of care for a nurse or regarding the practice of medicine.  He stated he would not be offering any opinions on whether any medication at any dose caused any patient behavior.  He additionally testified he could not state that any omission of care at Sunrise was the cause for Carol needing in-patient psychiatric care.  He stated he could not say that if Carol had been given more doses of Xanax, she would not have had the incidents and altercations.  He testified her symptoms – aggression, paranoia, agitation, anxiety, and mental decline – were all symptoms of

---

[10] *See Husby v. South Alabama Nursing Home, Inc.*, 712 So.2d 750 (Ala. 1998); *Barker v. Glen Meadows Nursing Home*, No. CA2008-06-145, 2009 WL 1581137 (Ohio Ct. App. Jun. 8, 2009).

vascular dementia, and he could not say with any degree of certainty that she would not have had these experiences without the care she received at Sunrise.

An expert opinion on causation "must be based 'on reasonable medical probability and not speculation or possibility.'" *Morris v. Boerste*, 641 S.W.3d 688, 698 (Ky. App. 2022) (quoting *Sakler v. Anesthesiology Associates, P.S.C.*, 50 S.W.3d 210, 213 (Ky. App. 2001)). Neither of Colin's proposed experts could state that Carol's decline was caused by any action or inaction on the part of anyone at Sunrise.

On the other hand, Sunrise's experts – a physician and a nurse – testified that all actions taken by Sunrise staff met the standard of care and that no action or inaction caused Carol's cognitive decline. Regarding the Xanax prescription, Lehman testified that the staff at Sunrise could not force Carol to take her medication. Significantly, the prescription of Xanax was "PRN"[11] or as needed. Lehman testified "everybody thinks, well, now we can put them in a nursing home and – and one of the things that upsets me a lot is the family was inferring that they could hide her medications in food, and in drink, and things like that. You cannot do that. It is the resident's right to know that you're giving them medications. So, if you're going to hide it in other food, that is specifically

---

[11] Latin term *pro re nata*, translated "as the thing is needed."

something that is not appropriate. You are not giving that resident the right to refuse."[12]

Negligence cannot be assumed merely from a poor outcome of a patient. *Meador v. Arnold*, 94 S.W.2d 626, 631 (Ky. 1936). Negligence cannot simply be inferred from an "undesirable result," and expert testimony is required. *Perkins v. Hausladen*, 828 S.W.2d 652, 655 (Ky. 1992). Dr. Sullivan stated it was unusual that Carol's condition declined so quickly in the five weeks she was at Sunrise. Dr. Sullivan also testified that he could not state that Carol's hospitalization would not have occurred without any actions taken by staff members at Sunrise. He additionally testified that Carol had documented incidents of aggression and paranoia both before and after her residency at Sunrise. It is perhaps not coincidental that decline was separately noted at The Brook, where there was no report of inadequate administrative care such as that alleged against Sunrise.

Colin's primary allegation of negligence involving Carol's care revolved around the relationship Carol had with another resident. Both Arbeit and Dr. Sullivan testified that this relationship should not have been allowed. Arbeit testified he believed Sunrise's failure to stop this relationship was a breach of an administrative standard of care. But the circuit court correctly held that Colin

---

[12] Deposition of Janine Lehman, January 18, 2022.

lacked the authority to restrict Carol's intimate relationship with another resident because she did not have guardianship of Carol. Both Sunrise and the circuit court point to KRS 216.515(11), which states: "Residents may associate and communicate privately with persons of their choice and send and receive personal mail unopened."

It is undisputed that Colin did not have guardianship over Carol. It is also undisputed that Colin did have a valid durable power of attorney and healthcare power of attorney executed by Carol. Colin argues that because she possesses these power of attorney documents, that Colin must be the one to consent to this type of relationship. We find this argument to be without merit.

KRS 311.621(8) defines health care decision as "consenting to, or withdrawing consent for, any medical procedure, treatment, or intervention." Colin argues that this gives her the authority to govern whether Carol is permitted to engage in an intimate relationship with another resident. The circuit court did not believe that this decision was within the realm of a "medical decision." Neither do we. Colin cites no authority for the proposition that the ability to have a relationship with another resident in a PCH is a medical decision. Nor was this Court able to find such authority.

Sunrise argued, and the circuit court agreed, that KRS 216.515(11) mandates the opposite of what Colin is arguing, that Sunrise prohibiting the

relationship may be a violation of law. We agree with this finding by the circuit court. KRS 216.515(17) states "if the resident is adjudicated mentally disabled in accordance with state law, the resident's guardian shall act on the resident's behalf in order that his rights be implemented." Again, it is undisputed that Carol had not been deemed legally disabled. Nowhere in Carol's Power of Attorney documents does it state that Carol gives Colin the right to decide who she may associate with. Colin is asking this Court to elevate a power of attorney to the level of a guardianship, which is contrary to law.[13] A power of attorney can be revoked at any time by the principal. A guardianship gives the guardian authority to make the types of decisions Colin was seeking in this case, while having the safeguards of a legal proceeding to prevent abuse.

Colin additionally asserted claims of negligence per se pursuant to KRS 216.515, also known as the Kentucky Residents' Rights Act. "Negligence *per se* 'is merely a negligence claim with a statutory standard of care substituted for the common law standard of care.'" *Young v. Carran,* 289 S.W.3d 586, 588-89 (Ky. App. 2008). Colin made allegations of violations of several rights in her Complaint, which include "(18) Each resident shall be treated with consideration, respect, and full recognition of his dignity and individuality, including privacy in

---

[13] Nor is it necessary. KRS 387.740 sets out the process for seeking emergency guardianship, which requires a review not more than one week after a petition is filed. KRS 387.740(3). Nothing prevented Colin or someone with Sunrise for that matter obtaining guardianship powers.

treatment and in care for his personal needs"; "(19) Every resident and the responsible party or his responsible family member or his guardian has the right to be fully informed of the residents' medical condition unless medically contraindicated and document by a physical in the resident's medical record"; and "(22) The resident's responsible party or family member or his guardian shall be notified immediately of any accident, sudden illness, disease, unexplained absence, or anything unusual involving the resident."

We must first note that many of the rights set forth in KRS 216.515 are more specific assertions of a common law personal injury action, and therefore they do not create any new theory of liability. *Overstreet v. Kindred Nursing Centers Limited Partnership*, 479 S.W.3d 69, 75 (Ky. 2015). Others, however, do not correspond with a common law personal injury. Therefore, those rights exist independent of any claim for personal injury. *Id.*

The Kentucky Supreme Court has determined "to the extent that the claims are based upon liabilities created by KRS 216.515, and are not simply restatements of the common law personal injury action, KRS 411.140 does not provide for their survival beyond the death of the resident." *Id.* at 77. These are rights personal to the resident, not a source of damages for heirs. At the time Sunrise sought summary judgment, Carol had passed away. Sunrise was therefore entitled to summary judgment on these claims.

-20-

The circuit court did not specifically address Colin's claims of negligence regarding KRS 209.005 *et seq*. These statutes deal specifically with adult abuse, neglect, or exploitation. There was no testimony or evidence presented that Sunrise abused, neglected, or exploited Carol in any way. The circumstances of the personal relationship allowed do not constitute abuse or neglect. Sunrise is entitled to summary judgment on this claim as well. Because Colin is unable to present any evidence that Sunrise was the proximate cause of Carol's purported injury, Carol's estate is not entitled to any damages.

## CONCLUSION

Because of the lack of qualified expert testimony regarding the applicable standard of care and medical causation, the Appellant is unable to create a genuine issue of material fact, and the Appellees were entitled to summary judgment as a matter of law. The Jefferson Circuit Court is AFFIRMED.


ALL CONCUR.

BRIEFS FOR APPELLANT:

S. Wade Yeoman
Corey Ann Finn
Louisville, Kentucky


ORAL ARGUMENT FOR
APPELLANT:

Corey Ann Finn
Louisville, Kentucky

BRIEF FOR APPELLEE SUNRISE
SENIOR LIVING MANAGEMENT,
INC.:

Michael F. Sutton
Kevin M. Murphy
Louisville, Kentucky


ORAL ARGUMENT FOR
APPELLEE:


Michael F. Sutton
Louisville, Kentucky